**UNITED STATES of America,
Appellee,**

v.

**Robert ALBRECHT and Marion Albrecht,
Appellants.**

**No. 73–1814.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1974.

Decided May 8, 1974.

Rehearing Denied June 13, 1974.

Robert Q. Price, Langdon, N. D., for appellants.

Edward J. Shawaker, Atty., Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for appellee.

Before GIBSON, BRIGHT and STEPHENSON, Circuit Judges.

GIBSON, Circuit Judge.

In this equitable action, the District Court[1] ordered Robert and Marion Albrecht, the defendants, to restore drainage ditches on their land and permanently enjoined them from draining any

---

[1]. The Honorable Paul Benson, Chief Judge, United States District Court, North Dakota, filed a memorandum of decision published as United States v. Albrecht, 364 F.Supp. 1349 (D.N.D.1973).

potholes on the same land. We affirm the District Court.

Defendant, Robert Albrecht, has farmed in northeastern North Dakota for 23 years, the latest 14 years in the Alsen area, the location of his farm, part of which contained the disputed ditched land in this case. From 1960–67, the Albrechts leased farm lands from Reinhart and Mary Herbel, the parents of Mrs. Albrecht. On September 26, 1964, the Herbels entered into the following agreement with the United States Department of Interior, which was acting pursuant to authority granted by 16 U.S.C. § 718d(c):

> The parties of the first part, for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid lands *as a waterfowl production area by not draining or permitting the draining,* through the transfer of appurtenant water rights or otherwise, *of any surface water including* lakes, ponds, marshes, sloughs, swales, swamps, or *potholes,* now existing or reoccurring due to natural causes on the above-described tract, *by ditching or any other means;* by not filling in with earth or any other material or leveling, any part or portion of the above-described tract on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the parties of the first part and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above. (emphasis added).

The document granting this right to the United States was entitled "Conveyance of Easement for Waterfowl Management Rights", and the Register of Deeds, Cavalier County, North Dakota, filed this document on December 7, 1964. The Herbels received $600 consideration. Robert Albrecht, then a tenant of the Herbels, knew of the easement after, but not before, it was conveyed. The easement was conveyed as to the NE ¼, Section 21, Township 160N, Range 62W, Cavalier County, North Dakota. On June 26, 1967, the Albrechts acquired a fee simple in the above-described land subject to the easements of record from the Herbels. Robert Albrecht had actual and constructive notice of the plaintiff's interest in the land.

The defendants' land is located in an area known to waterfowl biologists as the northeastern drift plain, which includes northeastern North Dakota and parts of the Canadian provinces of Manitoba, Saskatchewan, and Alberta. The northeastern drift plain is an example of a prairie pothole region, named for its major geographical feature. Each square mile of such land is dotted by approximately 70 to 80 potholes of three to four feet deep. The prairie pothole region is further divided into different classifications depending on geographical and climatological attributes that allow the retention of water through a certain number of summer days. The Albrechts' land is classified as pothole land that 42 per cent of the breeding ducks prefer, particularly because the potholes usually retain water through July or August, and therefore, provide an excellent environment for the production of aquatic invertebrates and aquatic plants, the basic foods for breeding adult ducks and their offspirng. Essential to the maintenance of the land as a waterfowl production area is the availability of shallow water in these numerous potholes during the usually drier summer months. On the other hand, too much water, as a lake area with its

deeper waters, does not provide the proper habitat for many species of duck to rear their young. Also, for the protection of their young, many species of duck prefer to be isolated in a small pothole, rather than to share a large lake.

In late 1969 and April, 1970, the Wetlands Management District, Devils Lake, North Dakota, a division of the United States Fish and Wildlife Service and the Bureau of Sport Fisheries and Wildlife, discovered by aerial observance that ditching was present on many lands in the Alsen area, including the Albrechts', to which the Government had obtained its easement. The Assistant Wetlands Manager at Devils Lake tried unsuccessfully to have the Albrechts fill the ditches. At the time of trial during the fall of 1973, 60–70 per cent of the landowners in the area had voluntarily complied with the Government and had restored their ditched lands. The ditch on the Albrechts' land was approximately five feet deep and 25–30 feet wide at the top and extended across the quarter section of land at some traverse. Apparently this same ditch extended for approximately 15 miles across several landowners' properties.

Harold F. Duebbert, an expert in waterfowl biology, testified that the ditching had the same effect as a drought, that water could only be retained briefly during the spring, that the vegetation had changed markedly on the Albrechts' land, and that the usefulness of the Albrechts' land as a waterfowl production area had been "significantly reduced."

Apparently, the entire Alsen area had become blotched with these man-made ditches. No one has explained who dug —or perhaps more exactly, excavated— this ditch. Due to the wonders of precise draftmanship, the Government has the benefits of the easement requiring the landowner not to drain or permit to be drained the waters of the pothole areas. The stealthy ditchdigger remains anonymous, and we are sure that no legend will be told in Alsen identifying the beneficial perpetrator.

Robert Albrecht complained during trial and as a legal argument on appeal that the defendants herein have been discriminatorily singled out by the Government concerning the enforcement of the easement. According to Albrecht, Allen Loewen, who owns higher land to the north of the Albrechts, had been pumping dry a 60–70 acre lake bottom area for farming despite assurances to the Government and Albrecht himself that the pumping would not continue. The pumped water ran onto the Albrechts' land and made it unsuitable for farming. Although the record is not entirely clear, evidently out of the quarter section involved, 35 acres of the Albrechts' land could not be farmed due to the natural potholes and 125 acres were tillable under normal water conditions. According to the Government at trial, Allen Loewen had agreed with the Government to no longer pump water, and an adjacent landowner to the Albrechts had also agreed to fill in the ditches on his land. The claimed discrimination does not affect the plaintiff's easement and is no defense to the plaintiff's right to have the easement observed and respected by the dominant fee owner.

Defendants' major argument is that North Dakota statutory law does not specifically allow the type of easement, servitude, or right to property conveyed by the Herbels to the Government. N.D. Cent.Code §§ 47–05–01 [easements] and 47–05–02 [servitudes] (1960). Defendants further assert, without direct authority, that North Dakota law only recognizes statutorily created interests in land and conclude that without statutory authorization the Government did not have the power to acquire the disputed interest in land.

The classification of the interest in land conveyed in this case according to the traditional analysis of easements is difficult. Here is created a non-appurtenant restriction on changing the natu-

ral contour of the land for the benefit of migratory birds. Traditionally, the interest in land conveyed would be an easement in gross, since such an easement "belongs to the owner of it [the United States] independently of his ownership or possession of any specific land." Restatement of Property, Explanatory Notes § 454, comment a at 2917 (1944). By the terms of the document, the Herbels conveyed to the United States this interest in property "for themselves and for their heirs, successors and assigns." This right to property use conveyed can be seen traditionally as an easement in gross for the benefit of the United States and to run indefinitely, as such easements in gross can. Restatement of Property, *supra* at 2918. In the end, however, and according to our following analysis, we agree with the District Court:

> In this case, [the Government] acquired an interest which it termed an easement. It is clear that the parties intended it to be a permanent interest. It appears to this Court to be immaterial what term is used to describe the interest acquired. To attach a label to it and then apply a rule of law applicable to that label that would wholly defeat the purpose of the program cannot be permitted.

United States v. Albrecht, 364 F.Supp. at 1351.

The Government argues that United States v. Little Lake Misere Land Co., 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) (hereinafter *Little Lake*), controls and that federal law applies in all situations arising under the Migratory Bird Hunting Stamp Act, and in par-

ticular 16 U.S.C. § 718d(c).[2] In interpreting the Migratory Bird Conservation Act in *Little Lake,* the Court rejected the Government's argument "that land acquisition agreements of the United States should be governed [virtually without qualification] by federally created federal law." *Little Lake, supra* at 595.

■ In *Little Lake,* the Court first held that federal courts have the power to determine and to apply federal law to the question of which substantive law should apply, the law of the state or the law as created by federal courts, when the case arises from or bears heavily upon a federal regulatory program. *Little Lake, supra* at 592. The District Court in this case first applied federal law, specifically *Little Lake,* to determine which substantive law should be applied. United States v. Albrecht, 364 F.Supp. 1349, 1351 (D.N.D.1973). We agree that this exercise of authority to determine choice-of-law was within the power of federal courts. The Migratory Bird Hunting Stamp Act, commonly known as the Duck Stamp Act, was passed originally in 1934 to raise funds by selling duck stamps to provide for the "acquisition of migratory bird refuges." H.R.Rep. No. 2182, 85th Cong., 2d Sess., U.S.Code Cong. & Adm.News, p. 3232 (1958). The Act was amended in 1958 to increase the cost of the duck stamp and, *inter alia,* to add 16 U.S.C. § 718d(c) to allow for the acquiring of property and interest in property to be designated as "Waterfowl Production Areas." From 1934 through 1958, only 13.7 per cent of revenues gained from the sale of duck stamps were used for

---

2. That section reads:
   The Secretary of the Interior is authorized to utilize funds made available under subsection (b) of this section for the purposes of such subsection, and such other funds as may be appropriated for the purposes of such subsection, or of this subsection, to acquire, or defray the expense incident to the acquisition by gift, devise, lease, purchase, or exchange of, small wetland and pothole areas, interests therein, and rights-of-way to provide ac-

cess thereto. Such small areas, to be designated as "Waterfowl Production Areas", may be acquired without regard to the limitations and requirements of the Migratory Bird Conservation Act, but all of the provisions of such Act which govern the administration and protection of lands acquired thereunder, except the inviolate sanctuary provisions of such Act, shall be applicable to areas acquired pursuant to this subsection.

refuge acquisition, and hunters and Congress "feared that unless the bill [the 1958 amendment] is enacted into law, in a few short years migratory bird hunting as it is presently carried on will be merely a matter of history." H.R.Rep. No. 2182, 85th Cong., 2d Sess., U.S. Code Cong. & Adm.News p. 3232 (1958). The Congress therefore increased the cost of duck stamps and committed the federal government to acquiring lands suitable for waterfowl production. The House Report said it would take 25 years to acquire the minimum of wildlife lands to effectuate the bill's purposes. Certainly the resolution of this case bears heavily upon a federal regulatory program.

■ As in *Little Lake*, the question becomes what substantive law to apply, federal or state. Appellants aid us little in determining whether North Dakota law would absolutely preclude the conveyance of the type of easement granted to the United States. Appellants only assert without authority that the statutory laws of North Dakota do not provide for this easement or interest in property and that North Dakota does not recognize any other rights to land not statutorily enacted. However, under the context of this case, while the determination of North Dakota law in regard to the validity of the property right conveyed to the United States would be useful, it is not controlling, particularly if viewed as aberrant or hostile to federal property rights. Assuming *arguendo* that North Dakota law would not permit the conveyance of the right to the United States in this case, the specific federal governmental interest in acquiring rights to property for waterfowl production areas is stronger than any possible "aberrant" or "hostile" North Dakota law that would preclude the conveyance granted in this case. *Little Lake, supra* at 595–596. We fully recognize that laws of real property are usually governed by the particular states[3] ; yet the reasonable property right conveyed to the United States in this case effectuates an important national concern, the acquisition of necessary land for waterfowl production areas, and should not be defeated by any possible North Dakota law barring the conveyance of this property right. To hold otherwise would be to permit the possibility that states could rely on local property laws to defeat the acquisition of reasonable rights to their citizens' property pursuant to 16 U.S.C. § 718d(c) and to destroy a national program of acquiring property to aid in the breeding of migratory birds. We, therefore, specifically hold that the property right conveyed to the United States in this case, whether or not deemed a valid easement or other property right under North Dakota law, was a valid conveyance under federal law and vested in the United States the rights as stated therein. Section 718d(c) specifically allows the United States to acquire wetland and pothole areas and the "interests therein."

■ Defendants also claim that the Herbels could not have granted this interest in land to the United States "that would be in its nature adverse to the exclusive possession of the defendants under their lease." The lease of the real property by defendants terminated by operation of North Dakota law when they acquired a fee simple title on June 26, 1967, N.D.Cent.Code § 47–16–14(3), and whatever rights the defendants had as lessees terminated. They then held title as fee owners subject to a valid easement granted by the prior fee owners.

■ In addition, appellants contend that the easement is void, because the United States acted beyond its authority in acquiring an easement over an entire quarter section of land, when only 35 acres could be classified as pothole land. We disagree. It was well within the power of the Secretary of the Interior to acquire the reasonable easement conveyed in this case. The Albrechts and their successors are not restricted from

3. *Little Lake, supra* at 591.

farming the land, when such land is dry due to natural causes.

◼ Appellants do not contest that their land has been ditched, that water has been drained from the property, and that the land is significantly less useful as a waterfowl production area. The terms of the easement have clearly been violated. The District Court's order requiring defendants to meet with representatives of the Bureau of Sport Fisheries and Wildlife to agree on an acceptable manner and time to restore the Albrechts' land to its previous natural state is affirmed. We also affirm the District Court's permanent injunction forbidding defendants from draining or permitting the draining of their land subject to the valid easement.

The District Court is affirmed.