Ross W. **CORTESE, A.R. Ceresa, and William V. March, as Trustees for the Rossmoor Liquidating Trust, Plaintiffs/Counterdefendants-Appellants,**

v.

**UNITED STATES of America, Defendant/Counterclaimant-Appellee.**

**and Related Counterclaims.**

**GREAT AMERICAN FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff-Appellant,**

and

Ross W. **Cortese, A.R. Ceresa, and William V. March, as Trustees for the Rossmoor Liquidating Trust, Plaintiffs/Counterdefendants,**

v.

**UNITED STATES of America, Defendant/Counterclaimant-Appellee.**

Nos. 84–5841, 84–5846.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1985.

Decided Feb. 12, 1986.

Rutan & Tucker, Leonard A. Hampel, David C. Larsen, Eric R. Newman, Costa Mesa, Cal., for plaintiffs/counterdefendants-appellants.

Levinson & Lieberman, Inc., Laurence R. Lieberman, Beverly Hills, Cal., Robert L. Klarquist, U.S. Dept. of Justice, Washington, D.C., for defendant/counterclaimant-appellee.

Before KENNEDY and ALARCON, Circuit Judges, and SOLOMON,[*] District Judge.

KENNEDY, Circuit Judge:

We consider, in the appeal before us, whether principles of California real property law control this case and whether the government may enforce restrictions on certain real property. We further address whether it was error for the trial judge to take a view of the property in the circumstances described below. We affirm in part, reverse in part, and remand for further proceedings.

The subject matter of the suit is a 4,000-foot-wide strip, containing about 170 acres, beneath the extended center line of the approach corridor to the main runway of the United States Marine Corps Air Station at El Toro, Orange County, California. The strip was purchased by a corporation known as Rossmoor Corporation to continue a previous owner's attempt to develop a residential retirement community. Following Rossmoor's acquisition of the tract, the Marine Corps took a series of actions to oppose development of the strip, in order to protect the approach corridor to the air station's runway. As a result, Rossmoor failed to obtain necessary financing and approvals for the project.

In 1964 Rossmoor agreed to a Declaration of Restrictions limiting development of the strip in question. The Marine Corps in return withdrew its opposition to the project. In 1967, however, Rossmoor filed an inverse condemnation petition in the United States Court of Claims, alleging the government's conduct in obtaining the Declaration of Restrictions was a taking of property without just compensation. Pursuant to a stipulation of settlement between the parties, Rossmoor executed a Supplemental Declaration of Restrictions (SDR) in 1974. The SDR permanently limited and restricted use of portions of the property for the benefit of the United States. The stipulation also provided for judgment against the United States in the amount of $2,706,000.00 plus interest, with an additional $272,041.24 in costs. The SDR was recorded in the land use records of Orange County.

The instant action was commenced by Rossmoor's successors in interest, who are the trustees of the Rossmoor Liquidating Trust. We continue to refer to them as Rossmoor. Rossmoor brought this action to quiet title against the United States, invoking the equitable doctrine of changed conditions. It sought to enjoin the United States from enforcing the restrictions under the SDR. In its answer and counterclaim, the government maintained that the restrictions were valid and enforceable and sought removal of a portion of a 12,000-square-foot warehouse and storage facility that had been constructed on the property, in violation, the government contended, of the SDR.

The warehouse had been constructed by Laguna Federal Savings and Loan, which had purchased 1.234 acres of land from Rossmoor in 1981. Laguna was added as a defendant to the United States counterclaim. Great American Federal Savings and Loan Association, the successor by merger to Laguna, answered and counterclaimed, alleging the United States was estopped from enforcing the SDR against it. Great American also sought indemnifi-

---

* Gus J. Solomon, Senior U.S. District Judge for the District of Oregon, sitting by designation.

cation from Rossmoor in the event the court decreed removal of the warehouse from the restricted area.

The trial court judgment declared the restrictions in favor of the United States were permanent and enforceable, without reference to the doctrine of changed conditions. Further it found that the warehouse had been constructed on the property in violation of the SDR and ordered its removal. Rossmoor and Great American appeal.

The district court divided the case into four trial phases. Phase 1 addressed the nature and extent of the government's interest under the SDR. If the interest were determined to be a covenant, Phase 2 would assess the enforceability of the restrictions under the doctrine of changed conditions. In Phase 3 the court was to consider the government's counterclaims against Rossmoor and Great American for removal of the warehouse. Phase 4 was reserved for Great American's counterclaim against Rossmoor for indemnification.

At the conclusion of Phase 1, the district court declined to identify the government's interest in the Rossmoor property as either an easement or a covenant, ruling only that the interest created by the SDR was permanent and not subject to the doctrine of changed conditions. Accordingly, Phase 2 was omitted as unnecessary. In Phase 3 the court granted the government's motion to dismiss its counterclaim against Rossmoor, while the counterclaim against Great American was retained. The trial court also granted Great American's motion to dismiss its claim against Rossmoor pursuant to an agreement that the indemnity action could be tried later in state court if the trial court's decisions were affirmed on appeal. Judgment was entered for the United States on the counterclaim, and this consolidated appeal followed. We affirm the judgment in favor of the United States on its counterclaim against Great American. However, as we conclude the SDR created covenants under California law, we reverse the portion of the judgment holding the government's interest under the

SDR to be permanent, and remand for consideration of the equitable doctrine of changed conditions.

■ We begin by considering Great American's claim that the conduct of the Marine Corps equitably estops the United States from seeking removal of the portion of the warehouse located on restricted property. Even without reference to defenses that may be available only to the government, *see Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("It is well-settled that the Government may not be estopped on the same terms as any other litigant."), four elements must be established to invoke the doctrine of equitable estoppel:

(1) The party to be estopped must know the facts;

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) The latter must be ignorant of the true facts; and

(4) He must rely on the former's conduct to his injury.

*United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *accord City of Long Beach v. Mansell*, 3 Cal.3d 462, 489, 476 P.2d 423, 442, 91 Cal. Rptr. 23, 42 (1970). The district court determined estoppel did not apply under this test, and the factual determinations in support of its ruling are not clearly erroneous. Prior to issuing a permit for the construction of Laguna's warehouse, Orange County authorities sent a copy of Laguna's application to the Marine Corps. A Marine Corps official reviewed the application and, failing to note the warehouse was to be constructed in part on property covered by the SDR, wrote to the county, recommending merely that an acoustical study be undertaken, and that the building height and exterior lighting features be designed in compliance with Federal Aviation Administration requirements. There is no indication that Laguna saw this letter or knew of

its existence. Even if the first three requirements for equitable estoppel were arguably satisfied here, the trial court did not err in finding Laguna failed to establish reliance on the conduct of the United States, as required by the fourth element required to invoke the estoppel doctrine. We affirm the ruling that the United States is not estopped.

■ We now address the arguments made by Rossmoor. First, Rossmoor contends the district court erred in declining to define the property interest created under the SDR. Under California law, the nature and extent of an interest in land must be identified with precision. *Warren v. Atchison, Topeka & Santa Fe Railway Co.*, 19 Cal.App.3d 24, 33–35, 96 Cal.Rptr. 317, 324 (1971) (citing *Peterson v. Gibbs*, 147 Cal. 1, 5, 81 P. 121, 122–23 (1905)). The district court, however, determined that it was inappropriate to rely on state law to resolve the dispute, and concluded that definition of the interest created under the SDR was not required. The issue whether state or federal law governs is a question of law, *see Olympic Sports Products, Inc. v. Universal Athletic Sales Co.*, 760 F.2d 910, 912 (9th Cir.1985) (diversity action), which we review de novo, *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc) (questions of law reviewable de novo), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Though federal courts, as a general rule, follow state law rather than federal law in resolving real property disputes, *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378–79, 97 S.Ct. 582, 590–91, 50 L.Ed.2d 550 (1977); *see Richmond Elks Hall Association v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir.1977), a limited exception exists for cases in which relevant state law is hostile to a congressionally declared program of national scope, *see, e.g., United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 594–97, 93 S.Ct. 2389, 2397–99, 37 L.Ed.2d 187 (1973) (state law would have abrogated the explicit terms of a prior land acquisition of the United States under the Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*, and was therefore not applied); *United States v. Albrecht*, 496 F.2d 906, 911 (8th Cir.1974) (state law barring conveyance of real property not applicable where it would hinder a national program of acquiring land for waterfowl production areas). The district court relied on this limited body of case law. in concluding that California law did not apply to the dispute at issue.

■ We find the *Lake Misere* exception inappropriate for this case. The government purchased its interest in the Rossmoor property to enhance the safe operation of the air station. No congressionally declared federal program of national scope is implicated, in contrast to the situation in both *Lake Misere* and *Albrecht,* where the government acquired its property interest in furtherance of a federal migratory bird protection program. Moreover, unlike the state laws at issue in *Lake Misere* and *Albrecht,* California real property law is neither aberrant nor hostile to the interests of the United States. To extend the narrow doctrine of *Lake Misere* and *Albrecht* as the government requests, would result in the application of federal law whenever state law would deprive the United States of any interest in land. *See United States v. California*, 655 F.2d 914, 919–20 (9th Cir.1980) (state law applied even though its application resulted in dismissal of the government's claims against the State of California for recovery of the costs of suppressing a forest fire; *Lake Misere* distinguished). Accordingly, we conclude the district court erred in not applying California law and in failing to define the property interest created under the SDR.

Rossmoor contends the property interest created by the SDR under California law is a restrictive covenant running with the land; the government contends the SDR created an easement. A covenant, under California law, is "a promise respecting the use of land." 3 B. Witkin, Summary of California Law, *Real Property* § 384, at 2077 (8th ed. 1973) (emphasis omitted). It is "an agreement by one party to do or not to do an act; the act usually concerns the

use of his land and affects the land of the party to whom the promise is made." 4 H. Miller & M. Starr, *Current Law of California Real Estate* § 25:1, at 154 (1977); *see also Wolff v. Fallon*, 44 Cal.2d 695, 284 P.2d 802 (1955) (building restrictions); *Werner v. Graham*, 181 Cal. 174, 183 P. 945 (1919) (building and development restrictions). An easement, on the other hand, is "an interest in the land, created by grant or prescription." 3 B. Whitkin, *supra*, at 2041 (emphasis omitted); *accord Marin County Hospital District v. Cicurel*, 154 Cal.App.2d 294, 298, 316 P.2d 32, 35 (1957). Additionally,

> [A]n express grant of an easement must be in writing and must conform to the requirements for transfers of interests in real property. The form of writing is usually a deed or an agreement. It must contain the essentials of a voluntary conveyance of land by deed: names of grantor and grantee; *operative words of conveyance;* description of the easement and the servient tenement sufficiently clear to locate it
>
> ....

I A. Bowman, *Odgen's Revised California Real Property Law* § 13.18, at 551 (C.E.B. 1974) (citations omitted) (emphasis added).

■ We hold that the SDR created covenants. It records Rossmoor's promise to restrict development of the tract in question for the benefit of the air station. In legal form, it is in close compliance with the California requirements for a covenant running with the land, namely:

(a) The land of the covenantor which is to be affected by such covenants, and the land of covenantee to be benefited, are particularly described in the instrument containing such covenants;

(b) Such successive owners of land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted to the covenantee;

(c) Each such act relates to the use, repair, maintenance or improvement of ... such land or some part thereof ...;

(d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated. Cal.Civ.Code § 1468 (West 1982). Further, throughout the SDR the restrictions on the Rossmoor property are consistently referred to as covenants, not as easements. Though the SDR is in writing, includes the names of the parties, and describes the restricted property as required by the definition of an easement, it contains no operative words of conveyance. Such words are essential to the creation of an easement under California law. I A. Bowman, *supra,* § 13.18, at 551. The conspicuous absence of words of conveyance in the SDR leads us to conclude that an easement was not created.

■ The government contends the characterization of the restrictions as "interests in land" by the Court of Claims during the condemnation proceedings indicates the SDR created easements, not covenants. We disagree. Restrictive covenants, or promises respecting land use, may be referred to as interests in property, *see, e.g., Russell v. Palos Verdes Properties*, 218 Cal.App.2d 754, 764, 32 Cal.Rptr. 488, 494 (1963), particularly for condemnation purposes, *see Southern California Edison Co. v. Bourgerie*, 9 Cal.3d 169, 507 P.2d 964, 107 Cal.Rptr. 76 (1973). *See also* Restatement of Property § 565(2) comments a, b (1944) ("a promise respecting the use of land ... has the effect of creating, to some extent, an interest in the land respecting the use of which the promise was made ... because the promise creates obligations which may be enforced against the successor to the land."). The government concedes that its right to limit development of the Rossmoor property derives from the SDR alone, and the SDR consistently refers to the development restrictions as covenants. That the restrictions were described as interests in land by the Court of Claims, therefore, is not dispositive of the question whether easements or covenants were created.

■ Rossmoor seeks to invoke the equitable doctrine of changed conditions to enjoin enforcement of the SDR. The doc-

trine of changed conditions operates to prevent the perpetuation of inequitable and oppressive restrictions on land use and development that would merely harass or injure one party without benefiting the other. *See Key v. McCabe*, 54 Cal.2d 736, 738–39, 356 P.2d 169, 170, 8 Cal.Rptr. 425, 426–27 (1960); *Wolff*, 44 Cal.2d at 696–97, 284 P.2d at 803; *Fairchild v. Raines*, 24 Cal.2d 818, 826, 151 P.2d 260, 264 (1944); *Hurd v. Albert*, 214 Cal. 15, 23, 3 P.2d 545, 548 (1931); *Welsch v. Goswick*, 130 Cal.App.3d 398, 405–06, 181 Cal.Rptr. 703, 708 (1982); 4 H. Miller & M. Starr, *supra*, § 25:11, at 187–91; 3 B. Witkin, *supra*, § 406, at 2096–98. Rossmoor sought to show that the conditions on and in the vicinity of the property in question have changed significantly since execution of the SDR in 1974, and that the restrictions in the SDR no longer serve the purpose of safety, but will continue to impair the value of the Rossmoor property. The district court, however, refused to consider evidence of changed conditions. It found that the restrictions in the SDR were intended to be permanent, absent termination in one of the two ways specified in the document, and determined that the doctrine of changed conditions could not apply to terminate the parties' agreement. While Rossmoor's changed condition argument on this state of the record does not seem compelling, it has sufficient substance so that the district court, in the exercise of its equitable powers, should consider the question on remand, taking such additional evidence as it deems necessary and appropriate.

■ The doctrine of changed conditions is an equitable doctrine which stays enforcement of unreasonably burdensome restrictions on land use, notwithstanding an agreement between the parties specifying the intended duration of the restrictions. *Cf. Fairchild*, 24 Cal.2d at 826, 151 P.2d at 264 ("It certainly is not the doctrine of courts of equity, to enforce ... every contract, in all cases, even where specific execution is found to be its legal intention and effect. It gives or withholds such decree according to its discretion, in view of the circumstances of the case ...." (quoting *Downs v. Kroeger*, 200 Cal. 743, 747, 254 P. 1101, 1102 (1927)). The intent of the parties regarding the duration of the SDR does not preclude applicability of the doctrine of changed conditions.

The government invokes res judicata and related principles of issue preclusion, arguing that the stipulation executed at the conclusion of the condemnation proceedings in the Court of Claims, which describes the SDR as "permanently limiting and restricting for the benefit of the United States the use of the described portions of its property," bars Rossmoor from seeking to terminate the restrictions. We reject this argument. As we have already held, the effect of the stipulation was to create covenants, not easements; and covenants are subject to the doctrine of changed conditions. Moreover, as only federal district courts have jurisdiction over quiet title actions involving property in which the United States has an interest, 28 U.S.C. § 1346(f) (1982), the instant proceedings could not have been brought in the Court of Claims. This said, it must be acknowledged that the consideration paid by the government for the SDR and the probable intent of the parties in putting the issue at rest are factors that weigh heavily in favor of the government when the trial court balances all of the equities in the case.

■ Thus, though it was within the discretion of the district court to determine whether to exercise its equitable powers, *Welsch*, 130 Cal.App.3d at 404–05, 181 Cal. Rptr. at 707, it was error to deny the applicability of the doctrine of changed conditions without allowing Rossmoor to present relevant evidence. We remand for the district court to determine when there are changed conditions and, if so, whether they bear on the enforceability of the covenants in the SDR.

Rossmoor next makes a contention that seems surprising on its face: It objects to the district court's ruling that granted the government's motion to dismiss the government's counterclaim *against* Rossmoor.

How Rossmoor claims prejudice by dismissal of the claim against it we presently disclose. Rossmoor and Great American agreed to defend jointly against the government's counterclaim, and Rossmoor undertook most of the preparation, including compilation of a list of witnesses and exhibits. To expedite trial, Great American dismissed its counterclaim against Rossmoor, reserving the right to sue Rossmoor for indemnification in state court in the event their joint defense to the government's counterclaim proved unsuccessful. The government had planned to present its case against Rossmoor by calling witnesses listed on Rossmoor's witness list. However, at the close of Phase 1 of the litigation, Rossmoor asserted that, pursuant to the local rules, each party could call only those persons included on its own list, and the district court agreed. The government, left with no case to present against Rossmoor, moved to dismiss. Once Rossmoor was dismissed as counterdefendant, Great American, similarly precluded from calling any of Rossmoor's witnesses or exhibits, could produce virtually no evidence. Thus, the government prevailed on its counterclaim against Great American. On appeal Rossmoor alleges it was prejudiced by the district court's ruling, as it is now subject to suit by Great American in state court. We find no abuse of the trial court's discretion, and have little sympathy for Rossmoor. Having requested a particular ruling, it is inappropriate for it to contest application of the same ruling to its own cocounterdefendant. It is unfortunate that issues of merit are decided by such a game, but Rossmoor was the first to declare itself a player. The district court acted within its discretion and was consistent in its rulings.

Finally, Rossmoor contends the trial court was biased because of the circumstances in which it took a view of the property. At trial the government suggested the court should see the subject property and runway from the air. Counsel for Rossmoor requested that any such view be taken in a way that all counsel could be present. The government insisted, however, that it was necessary for the trial court to take a view from a fighter jet, which had only two seats, one for the pilot, the other for the judge. Over Rossmoor's objection, the trial court adopted the government's suggestion.

■ At least two problems are inherent with the view. First, the government had assured the court and counsel for Rossmoor that all could hear the comments between the judge and the pilot. The radio transmission to the ground failed, however, and there is no record of the comments made to the judge when the view was presented. This makes it difficult for Rossmoor's counsel to rebut the government's presentation and difficult for any meaningful review of the court's ultimate decision on changed conditions. Second, the government acted improperly in presenting the judge dramatic and unnecessary hospitalities. On the occasion of the view, the Marine Corps organized a full day of events for the judge, including a complete physical examination, parachute and safety training, and pre-flight and post-flight briefings. The judge was given a code name, presented with a squadron patch and pin, and welcomed to the ranks of the United States Marine Corps. This gratuitous display was necessarily distressing to opposing counsel.

A court should not permit the actions of another, whether or not a party, to threaten the fact or appearance of judicial impartiality. If the court fails to take preventive or corrective measures to counter a derogation of its neutrality, such failure itself aggravates the threat to objectivity; and where the appearance of objectivity is reasonably open to question, recusal is necessary. 28 U.S.C. § 455(a). Not every attempt to patronize the court rises to this level of concern, however. Here we consider the conduct of the government to have been unfortunate, and we suggest the trial court should have taken early corrective action; we do not think recusal was required. In all of the circumstances of the case, the appearance of impartiality was not reasonably open to question.

We do note that as the question of changed conditions is subject to further hearing below in the first instance, the trial judge might prefer, in the exercise of his sound discretion, to reassign the case to a different judge in light of the concerns we have expressed.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.