No. 95-3996

United States of America,      *
                               *
                Appellee,      *
                               *  Appeal from the United States
        v.                     *  District Court for the
                               *  District of North Dakota.
Kerry Johansen, Michael        *
Johansen,                      *
                               *
                Appellants.    *


                  Submitted:  June 11, 1996

                     Filed:  August 19, 1996


Before BEAM and HEANEY, Circuit Judges, and BOGUE,[*] District Judge.


HEANEY, Circuit Judge.


    In the early 1960s, the federal government purchased easements on the farmland tracts of Kerry Johansen and Michael Johansen (the Johansens) for the maintenance of waterfowl production areas. After two unusually wet years in North Dakota, the Johansens requested the United States Fish and Wildlife Service (FWS) to delineate the extent of its wetland easements. The FWS refused, arguing that any wetlands that develop during wet years are subject to the easements' restrictions. Nevertheless, the Johansens proceeded to drain portions of their farmland tracts to contain the surface and subsurface water. The United States then charged the Johansens with unauthorized draining of wetlands in a Waterfowl Production Area, a violation of 16 U.S.C. § 668dd (1994). In

_____
[*]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

response to a motion in limine by the United States Attorney, the United States District Court for North Dakota prohibited the Johansens from arguing that the federal wetland easements covered only 105 acres on the three tracts and that more than that number of wetland acres remained intact after the draining. After entering a conditional guilty plea, the Johansens now appeal that order. We reverse.

I.

A. History of the Federal Conservation Program.

In 1929, Congress enacted the Migratory Bird Conservation Act, 45 Stat. 1222, ch. 257 (1929) (codified as 16 U.S.C. § 715 et. seq. (1994)). Recognizing the importance of preserving potholes for migratory waterfowl,[1] the Act authorized the Secretary of the Interior to acquire lands to be used for migratory bird sanctuaries. 16 U.S.C. § 715d. Acquisition was made subject to the consent of the state in which the land was located. 16 U.S.C. § 715f.[2] The Migratory Bird Hunting and Conservation Stamp Act was passed in 1934 to fund the acquisition of bird sanctuaries. 48 Stat. 451 (1934) (codified as 16 U.S.C. § 718 et seq. (1994)). Subsequently, the conservation effort's strategy shifted away from

_____

[1]Much of the State of North Dakota, as well as parts of the Canadian Provinces of Manitoba, Saskatchewan, and Alberta, constitutes what marine biologists call the northeastern drift plain. As a prairie pothole region, each square mile of the drift plain is dotted by as many as seventy to eighty potholes, three to four feet deep, that retain water through July or August because of the soil's poor drainage capacity. These geographical attributes are of particular importance to certain migratory waterfowl that prefer these potholes as a habitat to raise their young because they provide isolated protection and a source of aquatic food.

[2]North Dakota, the state in question here, gave its consent to the acquisition by the United States of areas in the State of North Dakota "as the United States may deem necessary for the establishment of migratory bird reservations." 1931 ND Laws, ch 207, p. 360.

2

the creation of large bird sanctuaries toward the preservation of wetlands on private property. Accordingly, federal law was amended in 1958 to permit the acquisition of wetland easements on individual parcels which were designated "Waterfowl Production Areas." Pub. L. 85-585, § 3, 72 Stat. 487 (1958) (codified as 16 U.S.C. § 718d(c) (1994)). The source of funding was later increased, but the acquisition of the wetland easements was conditioned on the consent of the governor of the state (as opposed to the state legislature as under the Migratory Bird Conservation Act). The Wetlands Act of 1961, Pub. L. 87-383, § 3, 75 Stat. 813 (codified as 16 U.S.C. § 715k-5 (1994)). From 1961 to 1977, the governors of North Dakota consented to the acquisition of easements covering 1.5 million acres of wetland. See North Dakota v. United States, 460 U.S. 300, 311 (1983). These consents further specified the maximum acreage that could be acquired in each county of North Dakota.

B.   The Steele County Tracts.

In the mid-1960s, as part of the Waterfowl Production Area Program, the FWS purchased easements on three tracts of land from the Johansens' predecessors. These tracts, described as Steele County tracts 21X, 24X, and 30X, consist of two half sections (319.58 acres and 317.70 acres) and a half section plus eighty acres (395.98 acres), respectively. As with most wetland easement purchases, the FWS used a standardized wetland conveyance developed for the program. The conveyance instrument granted the United States "an easement or right of use for the maintenance of the land described below as a waterfowl production area in perpetuity . . . ." As was standard practice prior to 1976, the conveyance then legally described the whole parcel. In exchange for the easement, the property owner was given $600 for each of the half-section parcels and $700 for tract 30X. The conditions imposed by the easement on the servient tenement are as follows:

3

> The parties of the first part . . . agree to cooperate in the maintenance of the aforesaid lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means . . . .

Along with the recorded easement conveyance, the FWS prepared an Easement Summary which provided information including the tract description, the tract acreage, the wetland acreage, and the cost of the wetland per acre. According to each of the summaries, the wetland acres purportedly purchased were thirty-three acres in both tract 21X and tract 24X and thirty-five acres in tract 30X (Summary Acreage). The FWS has subsequently published annual reports in which it continues to represent that it controls thirty-three, thirty-three, and thirty-five acres of wetland on the tracts in question. See, e.g., Annual Report of Lands Under Control of the U. S. Fish and Wildlife Service (Sept. 30, 1980) (Ex. D-154); U.S. Fish and Wildlife Service, Acreage Summary Record for Steele County Waterfowl Production Area (Ex. D-157).

C. The Johansens.

The spring of 1995 was a wet one in North Dakota. The Johansens, farmers in Steele County, North Dakota, were faced with the second consecutive wet year and farmland that could not support farm machinery due to the surface and subsurface water.[3] Aware that their farmland tracts were burdened by wetland easements, Kerry Johansen wrote the FWS to explain his problem and to ask "what water [he could] contain to get back to [his] normal farming practices." Letter from Kerry Johansen to Hoistad (Jan. 1, 1995) (Ex. D-120). In response, the FWS concurred that "your area has

---

[3]The Johansens allege that in 1995 there were 83.8, 64.9, and 67.1 wetland acres on tracts 21X, 24X, and 30X, respectively.

4

been hard hit in the last two years. . . . This particular tract of land has a high number of basins on it. This, I'm sure, combined with the high rain amounts has caused you some difficulty farming in the past year." Letter from Hoistad to Kerry Johansen (Mar. 17, 1995) (Ex. D-121). Despite its sympathy for the Johansens' difficulty, however, the FWS concluded: "The only provisions of the easement that allow for drainage are when [there] are safety or health concerns involved. Another way of saying this is unless your roads or farmstead is in danger of being flooded, no drainage can take place." Id. In spite of this admonition, the Johansens dug ditches on the tracts to contain the water.[4]

As a result of their ditching, the Johansens were charged with draining wetlands covered by FWS easements in violation of 16 U.S.C. § 668dd (1994). In their defense, the Johansens planned to introduce the Easement Summaries and proof that each parcel, after the draining, contained wetland acreage in excess of the acreage provided for in the Easement Summaries. The United States, in a motion in limine, sought to exclude the evidence as irrelevant, arguing that the Easement Summaries were not part of the recorded easement and that defense theories claiming any limitation of the wetland easements had been rejected by this court. Relying on this court's decision in United States v. Vesterso, 828 F.2d 1234 (8th Cir. 1987) (Heaney, J.), the district court held the defense was improper and excluded the proffered evidence. The Johansens then entered conditional guilty pleas, subject to the outcome of this appeal, from that pretrial order.

---

[4]The extent and impact of the ditching have not been determined by a trier of fact. It is undisputed that some wetlands were drained as a result of the ditches.

5

## II.

The government's prosecution of this case has been described by the Johansens as a shell game. We cannot disagree. The United States Attorney argues that prior decisions by this court have specifically interpreted the wetland easements to encompass all wetlands on the encumbered parcel. The government's argument, however, fails to acknowledge the ramifications of both the intervening Supreme Court decision in North Dakota, in which the Court adopted a more restricted interpretation of the wetland easements, and the representations made by the Solicitor General during that litigation.[5] The broad interpretation now advanced by the United States Attorney is not only inconsistent with the representations made by other federal officials, it would also raise serious questions with respect to limitations imposed by the easement program's enabling statute. Moreover, the stringent posture assumed in this enforcement prosecution does not comport with the efforts toward a "cooperative and helpful relationship between North Dakota, its farmers and political subdivisions, and the U.S. Fish and Wildlife Service" which is fundamental to the success of conservation programs. See North Dakota and U.S. Fish and Wildlife Service Agreements 1 (July, 1993) (Ex. D-159).[6]

---

[5]Implicit within the figures quoted in the Solicitor General's brief is the representation that the United States had acquired title to thirty-three, thirty-three, and thirty-five acres on tracts 21X, 24X, and 30X, respectively. See infra at 9-10. The United States Attorney argues that "even if this Court would accept an argument that the federal government must pick only 33 or 35 acres (as the case may be) in each tract to protect, what makes the defendant think we would not pick the acreage they have drained? Indeed, we have already done so by charging them with illegal draining." Appellee's Br. at 11. Given the Johansens' attempts to involve the federal government in the delineation of its rights to the land, this declaration is repugnant to the notions of fair notice.

[6]This court notes that North Dakota has filed an amicus brief on behalf of the Johansens.

A.   Interpretation of the Wetland Easements.

In essence, this case revolves around the interpretation of the wetland easements purchased by the federal government.  State law will generally govern the interpretation of a real property conveyance instrument, either through direct application or through the "borrowing" principles of federal law, so long as it is neither aberrant nor hostile to federal property rights.  See United States v. Little Lake Misere Land Co., 412 U.S. 580, 591-96 (1973); cf. United States v. Albrecht, 496 F.2d 906, 911 (8th Cir. 1974). Under North Dakota law, while the principles of contract law guide the inquiry, see N.D. Cent. Code § 47-09-11 (1978); Royse v. Easter Seal Society for Crippled Children & Adults, Inc., 256 N.W.2d 542, 544 (N.D. 1977), the "primary purpose in construing a deed is to ascertain and effectuate the intent of the grantor."  Malloy v. Boettcher, 334 N.W.2d 8, 9 (N.D. 1983).

This suit, as well as numerous other suits involving wetland easements, arises in large part because prior to 1976, the FWS described wetland easements by referring to the entire tract of land rather than to the particular area of the covered wetlands. Since 1976, the FWS has recorded a map locating the covered wetland acres as part of every easement document.  However, as a consequence of the former practice and the fact that prairie potholes, by nature, are ill-defined and subject to fluctuation, there has been a considerable amount of confusion regarding what the earlier wetland easements actually covered.  See, e.g., Albrecht, 496 F.2d 906; United States v. Seest, 631 F.2d 107 (8th Cir. 1980); United States v. Welte, 635 F. Supp. 388 (D.N.D. 1982), aff'd, 696 F.2d 999 (8th Cir. 1982).

The United States Attorney for North Dakota takes the position that all wetlands found on an encumbered tract at any given time are covered by the easement and cannot be drained in any fashion. In other words, there are no "uncovered wetlands" on the parcel

7

described by the easement.  The Johansens, however, claim that the easements cover only a portion of their property and not every wetland that might develop during any given year.  In support of their interpretation that only the potholes existing at the time of the easement conveyance are covered by the easement's restrictions, the Johansens point to the easement document language limiting drainage of potholes "now existing or reoccurring due to natural causes on the above-entitled land."  Primarily, however, the Johansens rely on the Easement Summaries which indicate that thirty-three wetland acres were purchased on tracts 21X and 24X and thirty-five wetland acres were purchased on tract 30X.

The United States Attorney rejects the Johansens' reliance on the Easement Summaries for two reasons.  First, the United States Attorney points out that the summary figures were not recorded as part of the easement document.  This fact, however, is not necessarily preclusive.  See Schulz v. Hauck, 312 N.W.2d 360, 363 (N.D. 1981) (holding that use of unrecorded, extrinsic evidence is permissible to interpret ambiguous grant language).  Second, the United States Attorney contends that these summaries do not evidence the parties' intent, but were merely "used by government negotiators as a yardstick of the purchase price."  Appellee's Br. at 10.

The government's interpretation is not unreasonable, given that the legal description of the easement includes the whole tract.  More importantly, this interpretation has been given to the easements by this court in past decisions.  See, e.g., Albrecht, 496 F.2d at 912 (holding that ditching encumbered parcel violated terms of easement); Seest, 631 F.2d at 108 (holding that ditching parcel, although not diminishing the surface water, altered the natural flow of surface and subsurface water, violating the terms of the easement); Welte, 635 F. Supp. at 389 ("Had the government obtained an easement on only 22 acres [the acreage identified in the Easement Summary], appellants would have a valid point.  The

8

government obtained its easement on all 160 acres [the entire parcel], however."). Thus, at least as of the early 1980s, there was considerable case law to support the government's position that the easements prevented drainage on any portion of the described parcel.

    B.   The Impact of <u>United States v. North Dakota</u>.

The interpretation given the easements by this court in the early 1980s was rejected by the Supreme Court. Starting in the 1970s, the cooperation that had marked the joint effort between the federal and state governments to provide waterfowl habitats began to break down. After North Dakota enacted a series of laws intended to restrain further federal purchase of wetlands, the United States brought suit seeking to have the laws declared invalid. One of the objections raised by North Dakota during the litigation was that the total area described by the wetland easements, 4,788,300 acres, exceeded the gubernatorial consents which had limited the FWS to 1.5 million wetland acres. This court held that the gubernatorial consents were not required for the acquisition of waterfowl production areas. <u>United States v. North Dakota</u>, 650 F.2d 911, 916 (8th Cir. 1981), <u>aff'd on other grounds</u>, 460 U.S. 300 (1983). The Supreme Court rejected that view, acknowledging that "Congress has conditioned any such acquisition upon the United States' obtaining the consent of the Governor of the State in which the land is located." 460 U.S. at 310 & n.13.

While conceding that the limitations imposed by the gubernatorial consent were applicable, the United States represented that it had not exceeded the maximum wetland acreage. In its brief to the Supreme Court, the United States contended:

> [W]hile the total gross area described in the easement documents is 4,788,300 acres, because the easement restrictions apply only to the wetlands acres North Dakota's contention that the United States already has

9

acquired more acreage than the gubernatorial approvals encompass is without merit. By contrast, since the United States obtained gubernatorial consent to acquire easements over 1,517,437 acres of wetlands and has only acquired easements over 764,522 wetland acres, it is entitled to acquire [] additional [] acres . . . .

Brief for the United States at 19, <u>North Dakota v. United States</u>, 460 U.S. 300 (1983) (No. 81-773) (citations omitted) (<u>North Dakota</u> Brief). The latter figure, 764,522, was based on the acreage figures provided in the Easement Summaries.[7] In other words, for the purposes of that litigation, the United States contended that the wetland easement restrictions applied only to the thirty-three, thirty-three, and thirty-five acres on the Johansens' tracts. The Supreme Court accepted the federal government's interpretation of the easement restrictions:

North Dakota next argues that the gubernatorial consents, if valid, have already been exhausted by acquisitions prior to 1977. This argument stems from the practice of including within each easement agreement the legal description of the entire parcel on which the wetlands are located, rather than merely the wetland areas to which the easement restrictions apply. If the entire parcels are counted toward the acreage permitted by the gubernatorial consents, the United States already has acquired nearly 4.8 million acres, far more than the 1.5 million acres authorized. The United States has conceded as much in its answers to North Dakota's interrogatories. App. 49 ("The total acreage described in the permanent easements . . . is 4,788,300 acres . . . ."). As the easement agreements make clear, however, the restrictions apply only to wetland areas and not to the entire parcels. . . . The fact that the

_____

[7]In response to an interrogatory asking, "How was the `764,522 wetland acres' figure computed," the FWS stated, "[t]he 764,522 wetland acres is a summation of the wetland acres reported on the Easement Summary Sheets for all waterfowl production area easements acquired in North Dakota. The figure is used for record keeping and reporting purposes." Defendants' Response to Plaintiffs' Request for Admissions, Interrogatories, and Demand for Production to Defendants, filed on April 5, 1982, Answer to Interrogatory No. 40(a), in <u>Board of Managers et al. v. Key, et al.</u> (later changed to <u>North Dakota v. Butterbaugh</u>), Civ. No. A2-81-178, on file in the trial court. Exhibit D-115, at 23.

easement agreements include descriptions of much larger parcels does not change the acreage of the wetlands over which the easements have been acquired.

North Dakota, 460 U.S. at 311 n.14.

Although this interpretation of the easements, that the restrictions "apply only to wetland areas and not to the entire parcel," seems clearly at odds with this court's prior decisions holding the contrary, the United States Attorney contends there is no inconsistency:

> There is simply nothing inconsistent between the U.S. Fish and Wildlife Service conceding that only the wetlands within the larger tract [are] covered by the drainage limitations and therefore that only that acreage counted against the "county consents" and . . . at the same time contending that all wetlands within a particular easement tract are subject to its limitations.

Appellee's Reply Br. at 3. What the United States Attorney fails to acknowledge, however, is that the Solicitor General's brief did not claim that the United States had acquired an interest in all wetlands on the parcel, but rather explicitly stated that the United States "ha[d] only acquired easements over 764,522 wetland acres," i.e., the Summary Acreage. North Dakota Brief at 19. The implication of the United States' brief in North Dakota is clear: the United States acquired easements over thirty-three acres on tracts 21X and 24X and thirty-five acres on tract 30X.

It is important to note, however, that although the Supreme Court generally accepted the federal government's argument limiting the easement restrictions to the encumbered parcels' wetlands, it did not explicitly limit the wetland easement to the Summary Acreage. The Court merely stated that "[t]he fact that the easement agreements include descriptions of much larger parcels does not change the acreage of the wetlands over which the easements have been acquired." North Dakota, 40 U.S. at 311 n.

11

14.[8] Statements made by the Solicitor General in his <u>North Dakota</u> brief and the FWS response to interrogatories are not a binding statement of the rights of the United States. <u>See</u> <u>Federal Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380, 383-84 (1947).

C.   Problems with a Fluctuating Easement.

Although the Court's language in <u>North Dakota</u> permits an interpretation of the easement to cover all wetlands on the encumbered tract rather than limiting the easements' scope to the Summary Acreage, doing so would create a host of problems.  Under this interpretation, the number of wetland acres subject to the easement restrictions would fluctuate with the amount of rainfall.  Not only is this inconsistent with the FWS Annual Summaries of the number of wetland acres under its control and traditional norms of real property conveyance, <u>see</u> Restatement of Property § 451, cmt. m (1944) (requiring definiteness), it would prohibit ditching on the entire, legally-described parcel.  According to the government's theory, any action that would inhibit the collection of water in a particular depression would violate its interest in existing and future wetlands.  Given that these properties are pocketed by depressions of various depths, however, any ditching will impact the formation of wetland.  <u>See</u> <u>Albrecht</u>, 496 F.2d at 909 ("[A]n expert in water biology testified that the ditching had the same effect as a drought . . . and that the usefulness of the [] land as a waterfowl production area had been `significantly reduced.'").  Thus, the wetland easements' restrictions, as interpreted by the United States Attorney, would apply to the entire parcel.  This was clearly and explicitly rejected by the Supreme Court in <u>North Dakota</u>.

_____

[8]The Court's treatment of this argument implicitly suggests, however, that the "acreage" is a set figure and not subject to fluctuation.

12

This interpretation also presents problems with respect to the gubernatorial-consent component of the program's authorizing statute. If the easement restrictions expanded with the amount of wetland present on a parcel at any particular time, the acreage of federal wetlands counted against the gubernatorial limitation would fluctuate as well. This figure would also need to be kept current to ensure compliance with the gubernatorial consents, something that the federal government has been reluctant to do in the past. See Vesterso, 828 F.2d at 1242. The United States Attorney's suggestion that the Easement Summary figures may be used to compile a total of wetland acreage to be applied against the gubernatorial consents, but need not relate to the potholes actually covered by the restrictions, Appellee's Reply Br. at 2, can be rejected out of hand. Clearly, in order for the gubernatorial consent provision of the enabling statute to be meaningful, there must be a direct correlation between the figure of federal wetland acres applied against the consents and the actual acreage restricted by the wetland easements. Even were the federal government to assume the task of maintaining an accurate and current tally of the existing wetlands, that fluctuating figure could conceivably exceed the gubernatorial limitation during a wet year, thereby violating the terms of the easement program's enabling statute.[9] In its reply brief, the United States Attorney's Office responds to this possibility as follows:

> In the unlikely event the State could prove that the total wetland acres under easement in a particular county, when at maximum fill, exceeded the gubernatorial consents previously given, such an assumption might give rise to a right to bring a declaratory judgment or contract action against the federal government. What such a suit might yield is unclear, but what is clear is

---

[9]This court has not received any assurances that there is enough room under the cap to make this possibility unlikely. Given that a wet year is likely to impact the water levels of an entire county similarly and that the gubernatorial limitations are imposed on a county-by-county basis, the possibility of exceeding the gubernatorial consents' acreage limitation could not be discounted.

> that it would not void all easements taken in that county
> or confer upon either the State or the landowners the
> right to choose which wetlands within each easement the
> federal government gets to keep.

Appellee's Reply Br. at 4 (emphasis added). We decline to follow the "cross-that-bridge-when-you-get-to-it" approach espoused by the United States Attorney's Office. Given the choice, we believe it more prudent to avoid this possibility by interpreting the easements' scope in a manner that fixes the federal acreage counted against the gubernatorial consent limitation.

Therefore, we hold that the federal wetland easements are limited to the acreage provided in the Easement Summaries. This approach has the additional advantage of consistency with prior representations by the federal government of its interest in the properties, including the FWS Annual Survey and the Solicitor General's position in the North Dakota litigation.

    D.    Post-North Dakota Case Law.

In its motion in limine to the district court, the United States Attorney argued that this court's decision in United States v. Vesterso, 828 F.2d 1234 (8th Cir. 1987), rejected limiting the federal wetland easements to the Summary Acreage. In Vesterso, this court considered a case in which a North Dakota county water board had undertaken two drainage projects on properties subject to federal wetland easements. Id. at 1237. Despite being advised of the federal easements by the state water commission, the county water board completed the projects without conferring with or notifying the FWS. Id. at 1238.

In affirming the convictions, we wrote, "it is sufficient for the United States to prove beyond a reasonable doubt that identifiable wetlands were damaged and that those wetlands were within parcels subject to federal easements." Id. at 1242. The

14

United States Attorney interprets this language to mean that the drainage of any wetlands on a burdened parcel violates section 668dd. This language, however, must be understood within its context in the opinion: rejecting the defendants' assertion that the federal government had not ensured compliance with the gubernatorial limitation by identifying all wetlands covered by the federal easements. Id. at 1241. In the same section, we wrote:

> Before the United States can prove a person damaged federal property as prohibited by section 668dd(c), it does not have to describe legally each wetland to which the restrictions apply and further determine whether the total wetland acreage exceeds the limits imposed by the gubernatorial consent for the county.

Id. at 1242. In this context, our discussion is simply understood to mean that the government did not need to legally describe the confines of each covered wetland under the pre-1976 easements to ensure compliance with the gubernatorial consent limitation, a question already answered by the Supreme Court in North Dakota.

The language in Vesterso regarding what the United States must prove is better understood to mean that the United States must prove beyond a reasonable doubt that identifiable, covered wetlands (as existing at the time of the easement's conveyance and described in the Easement Summary) were damaged and that the defendant knew that the parcel was subject to a federal easement. See Vesterso, 828 F.2d at 1244 (holding that defendants, who knew that the parcel was encumbered by a wetland easement, cannot claim that they did not know a particular wetland was covered by the easement because such a lack of knowledge would be caused by "willful blindness."). This meaning is made clearer later in Vesterso when we concluded:

> We realize that the federal wetland easements in North Dakota have generated controversy and, in some instances, frustration for landowners. We point out, however, that the State of North Dakota and landowners are not without recourse if the easements cause flooding, for example, which results from nonnatural obstructions

15

to water flow. <u>The prudent course in any event requires consultation with the Fish and Wildlife Service before undertaking drainage on parcels covered by easements</u>. . . . There is no evidence in the record indicating that [] cooperation would not have been forthcoming in this case. Instead of seeking cooperation, the appellants acted on their own by digging a ditch approximately three feet deep and fifteen feet wide across the easement in clear violation of the Wildlife Refuge Act.

<u>Id.</u> at 1245 (emphasis added). Having been so advised by this court, the Johansens sought cooperation from the FWS to contain the flooding that emersed their farmland. Unfortunately, the cooperation to which we alluded was not forthcoming.

Our decision in <u>United States v. Schoenborn</u>, 860 F.2d 1448 (8th Cir. 1987), reiterates this court's revised interpretation of the wetland easements. In that case, we reviewed the district court's finding that a Minnesota farmer had violated a wetland easement. Specifically, Schoenborn's violations consisted of draining four basins (as potholes are known in Minnesota) and filling nine ditches. On review of each individual alleged violation, this court examined evidence that the specific potholes existed at the time of the easement conveyance, a clear departure from our prior practice focusing on any ditching of the burdened parcel, <u>cf.</u> <u>Albrecht</u>, 496 F.2d at 911, as well as the state of the basin at trial. Thus, <u>Schoenborn</u> implicitly acknowledged the limited scope of the wetland easements.

E. The District Court's Pretrial Order.

In this case, the district court's decision was predicated on a fundamental (albeit understandable) misinterpretation of this circuit's case law with respect to the scope of federal wetland easements. Therefore, we review the district court's pretrial order excluding evidence de novo. <u>See</u> <u>United States v. Singer Mfg. Co.</u>, 374 U.S. 174, 192-93 (1963). We hold that the United States' wetland easements acquired title on the acreage specified in the

16

Easement Summaries.  Although the mens rea element of this crime is fulfilled by proof that the defendant knew the parcel was subject to a wetland easement, see Vesterso, 828 F.2d at 1244, the government must still prove that the defendant drained the Summary Acreage covered by the federal wetland easement.  The converse is also true:  a defendant must be permitted to introduce evidence proving that they did not drain the Summary Acreage.

III.  CONCLUSION

The wetland acquisition program was conceived of as a partnership between the federal government, the states, and individual property owners.  As with any partnership, success requires good faith and reasonability.  Although the United States Attorney pays lip service to the program's goal of co-existence between Waterfowl Production Areas and "normal farming practices," the government ignores the obvious potential consequence of its interpretation:  the reduction of cultivable land on tract 21X by over sixteen percent would be a significant economic impediment to the continued viability of normal farming practices.  It strikes this court as contrary to the program's goal of reasonable cooperation to refuse a request to identify the scope of the federal government's interest in a property and then prosecute the property owner for making his best efforts to contain surplus water to the protected federal wetlands.  Therefore, we remand this case to the district court for action consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

17