NORTH DAKOTA STATE WATER COMMISSION and North Dakota State Engineer, Plaintiffs and Appellants

v.

BOARD OF MANAGERS, Cavalier County Water Resource District, and Willard Crockett, Defendants and Appellees.

Civ. No. 10252.

Supreme Court of North Dakota.

April 12, 1983.

Michael Dwyer, Sp. Asst. Atty. Gen., and Joseph J. Cichy, Asst. Atty. Gen., North Dakota State Water Com'n, Bismarck, for appellants; argued by Michael Dwyer, Bismarck.

Price & LaQua, Langdon, for appellees Bd. of Managers and Cavalier County Water Resource Dist.; argued by Robert Q. Price, Langdon.

Alan Grindberg, Steele, for appellee Willard Crockett; argued by Alan Grindberg, Steele.

PEDERSON, Justice.

This is an appeal from a judgment of the district court of Cavalier County dismissing an action brought by the State Water Commission and the State Engineer to control the drainage of water from Rush Lake, a meandered lake located in Cavalier County.[1] The judgment is affirmed. Rights, status, and legal relationships are declared.

Rush Lake is a shallow lake and the land surrounding it is relatively flat. The area has recurring water management problems in years of heavy precipitation. To alleviate these problems, dikes, ditches, and other drainage systems have been built around the lake. It is because of the construction of some of these structures that the instant case arises. The Commission and the State Engineer contend that unauthorized dikes and drainage ditches constructed by the defendants have "substantially diminished

---

1. Although the State Water Commission and State Engineer describe this suit, pursuant to the North Dakota Environmental Law Enforcement Act of 1975, as one to enforce the State's environmental laws (Ch. 32–40, NDCC), for our convenience we have treated it as a declaratory judgment action under Ch. 32–23, NDCC and Rule 57, NDRCivP. A justiciable controversy exists, warranting a declaration of rights, status, and legal relationships.

Rush Lake and threaten to totally destroy it." Relying upon §§ 61–15–01 and 61–15–02, NDCC, the Commission claims the authority to regulate and control the construction of dams, dikes, and the like on navigable lakes which have been meandered. Pursuant to this power, the Commission and the State Engineer seek to close or modify "unauthorized" dikes and ditches currently draining Rush Lake.

To more fully understand the legal issues presented in this case, a brief history of the lake and its water management problems is helpful. One of the trial court memorandum opinions stated that the parties were concerned about resolving "a problem which seemed to defy solution."

The land surrounding Rush Lake was surveyed by the United States government in 1884 and 1885, at which time the lake was meandered. By 1916 the waters of Rush Lake had gradually receded and, as a result, a large part of the lake bed became dry. Those who owned the land contiguous to and abutting the meander line claimed riparian ownership of the lake bed and brought suit to quiet title in that land. In *Brignall v. Hannah,* 34 N.D. 174, 157 N.W. 1042 (1916), this court stated that Rush Lake was a meandered nonnavigable lake. The court then applied the common-law rule that "[l]and underlying the water of an inland nonnavigable lake is the subject of private ownership . . . ." 34 N.D. at 185, 157 N.W. at 1045, and concluded that riparian owners contiguous to the lake bed owned it in severalty.

Rush Lake was again the subject of litigation in *Willard Crockett v. Ole Johnson* (N.D.Dist.Court 1969). Willard Crockett owns a large portion of the bed and land adjacent to Rush Lake. In 1955 Crockett built a dike across the bed of Rush Lake to control the flow of water out of the lake. Because of the dike a large portion of the lake bed is dry and the amount of land that Crockett can farm is greatly increased. In 1966 Crockett learned that the conservation and flood control district and others were planning to open the dike because land south (upstream) of the dike was flooding. If the dike were opened, approximately 2,000 acres of Crockett's land would have flooded. Crockett sought and was granted a temporary restraining order to prevent the townships from removing the dike. The parties then stipulated that as a temporary solution to the flooding problem open culverts would be placed in the dike to release some of the water held back by the dike. An engineer would also be designated to recommend a long-term water management project designed to control flooding. A court-appointed special master would oversee implementation of the project. Finally, the Cavalier County Water Resource Board[2] was to create a drainage district to implement the recommended water management plan.

The water management project recommended by the engineer included cleaning the two creeks that are the natural outlets of Rush Lake, constructing a drain into one creek, and installing three culverts. The Commission and State Engineer participated in the resolution of disputes which resulted in approval of the project, although they were not parties to the litigation. After completion of these improvements, the case was dismissed in 1969.

The three culverts did not adequately control water drainage apparently because they were destroyed by flood waters and Crockett began building additional ditches, dikes, and culverts in 1973, the construction of which was completed before July 1, 1975. Although Cavalier County Water Resource District knew of these additional drainage ditches, Crockett never obtained a permit or other authorization from the State Water Commission or the State Engineer. These additional drainage ditches, the Commission argued, threatened to completely drain Rush Lake and the Commission brought suit against Crockett and the Cavalier County Water Resource District. The Com-

---

2. At the time of the lawsuit, water resource districts were known as water management districts. The Legislature changed the name of the districts in 1981. 1981 N.D.Sess.Laws, Ch. 632. Rule 25(d), NDRCivP.

mission sought to close or modify the "unauthorized" drainage ditches and asked the court to order a "permanent level" for Rush Lake. The court, in four separate memorandums of opinions, granted Crockett's and Cavalier County Water Resource District's motion for summary judgment and dismissed the case.

## I.

The North Dakota Legislature in 1937 created the State Water Commission as the institution responsible for substantial control of water usage within the state. Section 61–02–01, NDCC.[3] An examination of Chapter 61–02 reveals that the Legislature delegated broad powers to the Commission. The powers and duties of the Commission are enumerated in § 61–02–14, NDCC. The Commission has the authority, among other things:

"1. To investigate, ... regulate, ... and supervise all works, dams, and projects, public and private, which in its judgment may be necessary or advisable:

.  .  .  .  .

"d. To conserve and develop the waters within the natural watershed areas of the state and, subject to vested rights, to divert the waters within a watershed area to another watershed area and the waters of any river, lake or stream into another river, lake or stream.

.  .  .  .  .

"h. To promote the maintenance of existing drainage channels in agricultural lands and to construct any needed channels.

.  .  .  .  .

"j. To finance the construction, establishment, operation, and maintenance of public and private works, dams, and irrigation projects, which in its judgment may be necessary and advisable.

.  .  .  .  .

"l. To provide for the drainage of lands injured by or susceptible of injury from excessive rainfall ..., to aid and cooperate with ... any county, township, drainage district or irrigation district of this state, or of other states, in the construction or improvement of such drains."

The Commission also has the authority to exercise all express and implied rights to "carry out all of the expressed purposes of this chapter and all of the purposes reasonably implied incidentally thereto or lawfully connected therewith." Section 61–02–14(5), NDCC.

Section 61–02–01, a declaration of policy, provides:

"It is hereby declared that the general welfare and the protection of the lives, health, property, and the rights of all the people of this state require that the conservation and control of waters in this state, public or private, navigable or unnavigable, ... [and] the control of floods ... involve and necessitate the exercise of the sovereign powers of this state ... It is declared further that any and all exercise of sovereign powers of this state in investigating, constructing, maintaining, regulating, supervising, and controlling any system of works ... [is vested in] the state water conservation commission ...."

All waters within the state belong to the public and may be appropriated for beneficial use as provided by statute. Section 61–01–01, NDCC. The right to use the waters of the state is granted by the State Engineer, subject to review and amendment by the Commission. Section 61–02–30, NDCC. Although not controlling, it is interesting to note that North Dakota's Constitution, Article XI, § 3 states:

"All flowing streams and natural watercourses shall forever remain the

---

3.  For a general discussion of the Water Commission see Bard & Beck, *An Institutional Overview of the North Dakota State Water Conservation Commission: Its Operation and* *Setting,* 46 N.D.L.Rev. 31 (1969). See also Beck & Hart, *The Nature and Extent of Rights in Water in North Dakota,* 51 N.D.L.Rev. 250 (1974).

property of the state for mining, irrigating and manufacturing purposes."

▮ The State holds the navigable waters in "trust" for the public. *United Plainsmen v. N.D. State Water Cons.,* 247 N.W.2d 457, 461 (N.D.1976). See also, *Wisconsin's Environmental Decade v. D.N.R.,* 85 Wis.2d 518, 271 N.W.2d 69 (1978); *Herschman v. State Dept. of Natural Resources,* 303 Minn. 50, 225 N.W.2d 841 (1975); *Iowa Natural Resources Council v. Van Zee,* 261 Iowa 1287, 158 N.W.2d 111 (1968). The State does not lose its right to exercise authority over a lake merely because its lake bed is subject to private ownership. As the Supreme Court of Minnesota noted, "[t]he ownership of beds of streams and lakes is quite a different matter from the right to control waters." *State v. Adams,* 251 Minn. 521, 546, 89 N.W.2d 661, 678 (1957), *cert. denied,* 358 U.S. 826, 79 S.Ct. 45, 3 L.Ed.2d 67 (1958). See also *Herschman, supra,* 303 Minn. at 54, 225 N.W.2d at 844.

▮ Protecting the integrity of the waters of the state is a valid exercise of the Commission's duties pursuant to § 61–02–14, NDCC, as well as being part of the state's affirmative duty under the "public trust" doctrine.[4] Accordingly, we are satisfied that the Commission has the authority

to control the drainage of waters from Rush Lake.[5]

## II.

The Commission and the State Engineer contend that when the "additional" drainage systems not provided by the 1969 water management project were constructed in and around Rush Lake, §§ 61–01–22 and 61–15–08, NDCC were violated.

▮ Because construction of the drainage system which is the subject of this lawsuit occurred before § 61–01–22, NDCC was amended, the Commission argues that the versions of § 61–01–22 and § 61–15–08 in effect at the time should apply to the present action. We agree.

▮ Until its amendment in 1975, § 61–01–22, NDCC (which required the approval of the Commission before a lake with a watershed area of eighty acres or more could be drained) did not apply to "any county which has a board of drain commissioners . . . ." The lower court found that the Cavalier County Water Resource District was created pursuant to § 61–16–07, NDCC and had, under § 61–16–11(11), NDCC "all of the powers conferred by statutes upon a board of county drain commissioners." The lower court also found that the Cavalier County Water Resource Dis-

---

4. The Commission argued that the State of North Dakota, and thus the Commission, had control over Rush Lake pursuant to §§ 61–15–01 and 61–15–02, NDCC.

    Section 61–15–01 provides in part that:
    "In this chapter, unless the context or subject matter otherwise requires:
    "1. . . .
    "2. 'A navigable lake' shall include any lake which shall have been meandered and its metes and bounds established by the government of the United States in the survey of public lands."
    Section 61–15–02 provides that:
    "By virtue of its police power the state shall be vested with the control of navigable lakes which have been meandered and their metes and bounds established by the government of the United States in the survey of public lands, within the ordinary high-water mark for the purpose of constructing, maintaining, and operating dams, dikes, ditches, fills, spillways, or other structures to promote the conservation, development, storage, distribution, and utilization of such water

    and the propagation and preservation of wildlife."
    The Commission argued that the Legislature did not use the term "navigable" in its ordinary sense in §§ 61–15–01 and 61–15–02, but instead was merely attempting to exercise police power authority over all lakes which are meandered.
    Because we find that the Commission's authority to regulate the drainage of nonnavigable lakes stems from § 61–02–14, NDCC, rather than from § 61–15–02, we will not discuss the possible interpretations of the term "navigable" as it is used in § 61–15–02.

5. The Commission not only has the authority to control drainage of a lake, but also has the authority pursuant to § 61–02–14, NDCC, to restore a lake to its natural water level. Should the Commission authorize reflooding of a lake, it may, of course, be subject to potential suits by affected landowners with vested rights. See § 61–02–14(1)(d), NDCC.

trict was acting as a county drain commission pursuant to § 61–16–11(11), NDCC during the time it implemented the court-supervised 1969 water management plan. Thus, at least before the exemption in § 61–01–22 was deleted in 1975, the Cavalier County Water Resource District was not required to obtain a permit from the Commission before constructing the drainage systems included in the 1969 water management plan.

The Commission agrees that the Cavalier County Water Resource District was not required to apply for a permit pursuant to § 61–01–22 while implementing the 1969 water management plan because it was acting as a county drain commission. The Commission, however, claims that the Cavalier County Water Resource District would not be acting as a drain commission if it authorized construction of any drainage system not included in the 1969 water management plan. Thus, the Commission claims the court erred by finding that Cavalier County Water Resource District was exempt from obtaining a permit from the Commission for construction of "unauthorized" drainage systems before § 61–01–22 was amended. Resolution of this issue depends upon whether or not the board of drain commissioners could authorize construction of drains not provided for in the 1969 water management plan.

It is helpful in understanding the State's argument to know something of the history of North Dakota's drainage law.

North Dakota's drainage law has existed since 1883, Laws of Dakota, Ch. 75 (1883), and has since been the subject of much legislative activity. A review of the major revisions leads to one basic conclusion: the drainage laws have been changed often over the years and a myriad of exceptions, cross-referrals, and administrative complexities have been added. Nevertheless, the basic method of establishing a drainage project remains the same.

In 1975 drainage projects were handled by water management districts (Chapter 61–16, NDCC), county drain boards (Chapter 61–21, NDCC), or through the federal government under the Watershed Protection and Flood Prevention Act, 68 Stat. 666 (1954), as amended, 16 U.S.C. §§ 1001–1009 (1964). See also Beck & Bohlman, *Drainage Law in North Dakota: An Overview*, 47 N.D.L.Rev. 471 (1971).

■ A board of drain commissioners was authorized to implement drainage projects within each county of the state. Section 61–21–03, NDCC, repealed by 1981 N.D. Sess.Laws, Ch. 632, § 12. Before a drain[6] was established, a written petition stating the beginning and ending points of the proposed drain and its general course was submitted to the board. Section 61–21–10, NDCC. The board inspected the line of the proposed drain and obtained an engineer's or surveyor's report on the specifications and costs of the proposed drain. Section 61–21–12, NDCC. After receiving the engineer's report, the board held a public hearing at which affected landowners were entitled to vote either in favor of or against the proposal. Section 61–21–13, NDCC. If more than fifty percent of the votes were in favor of the proposed drain and the board determined that the project costs would not outweigh the anticipated benefits, the board prepared an order establishing the drain. Section 61–21–15, NDCC. The board then assessed the costs of construction and financed the drainage district. Sections 61–21–19 and 61–21–06, NDCC. After having established a drain, the board had the duty to keep the drain open and in repair. Section 61–21–42, NDCC. In addition to maintaining drains, the board supervised the establishment of additional drains which flow into the original drain, called lateral drains. Sections 61–21–39 and 61–21–01(4), NDCC.

A drainage project could also be handled by a water management district created pursuant to Chapter 61–16, NDCC. The

---

**6.** A drain includes any natural watercourse, opened or to be opened and improved, for drainage purposes and artificial drains of all kinds "... including dikes and appurtenant works ...." Section 61–21–01, NDCC.

water management district encompassed functions in addition to drainage, such as water conservation, flood control, and watershed improvement[7]. Section 61–16–01(4), NDCC. Repealed by 1981 N.D.Sess. Laws, Ch. 632, § 11; current version at § 61–16.1–09, NDCC.

■ After reviewing the functions of a county drain board, we find nothing in Chapter 61–21 to support the Commission's argument that the exemption in § 61–01–22 (exempting a county drain board from obtaining a permit from the State Water Commission) did not apply beyond the board's performance of the 1969 water management plan. The board's authority to establish drains was not dependent upon receiving a court-supervised water management plan. The board had the specific authority to establish drainage systems. Section 61–21–02, NDCC. Thus, the board's authority to oversee additional drains did not cease when the 1969 water management plan was completed, and the exemption in § 61–01–22 remained applicable to Cavalier County until its amendment; consequently the board had the authority in this case to proceed as it did without securing a permit from the State Engineer.

### III.

■ The Commission contends that § 61–01–22 and § 61–15–08, NDCC required Cavalier County and Crockett to obtain a permit from both the Commission and the State Engineer before additional drains could be added to Rush Lake. Section 61–01–22, NDCC, prior to its amendment in 1975,[8] provided that:

---

7. In light of the duplication of functions between county drain boards and water management districts, several authorities recommended that county drain boards be phased out in favor of water management districts. *Drainage Law in North Dakota, supra,* 47 N.D.L.Rev. 471, 500 (1971). See also 1963 Legislative Council Report at 54. The 1981 Legislature eliminated existing water management districts and county drain boards by repealing much of Chapters 61–16 and 61–21, and creating "water resource districts." Chapter 61–16.1, NDCC. 1981 N.D.Sess.Laws, Ch. 632.

"Any person, public or private corporation, proposing to drain waters from a pond, slough or lake, which impounds waters gathered therein and drained from an area comprising eighty acres or more into a natural watercourse, as defined by section 61–01–06, or into a draw or natural drainway, before constructing a ditch or facility for the purpose of such drainage *shall submit to the state water conservation commission an application for a permit to do so....* The provisions of this chapter shall not ... apply to any county which has a board of drain commissioners ...." [Emphasis added.]

If sixty percent or more of the watershed area of the watercourse, draw, or natural drainway was "embraced" within the boundaries of a water conservation and flood control district, then § 61–01–22 required the state water conservation commission to "refer the application to the board of commissioners of such water conservation district for consideration and approval." Thus, the approval of the Commission was not required if the drainage systems fell within the sole jurisdiction of the water conservation district. If the area did not have a water conservation district, then the Commission was to consider and approve the application itself.

Section 61–15–08, NDCC, provides that:

"Any person who, *without written consent of the state engineer,* shall drain ... any lake or pond, which has been meandered ... shall be guilty of a class B misdemeanor." [Emphasis added.]

The Commission argued that the requirements of § 61–15–08 were in addition to

---

8. Section 61–01–22, NDCC was amended by the Legislature in 1975 and again in 1977. It was repealed in 1981. (Current version appears at 61–16.1–41, NDCC.) 1981 N.D.Sess. Laws, Ch. 632. Section 61–16.1–41 now provides that before a lake with a watershed area of eighty acres or more may be drained, a permit application must be submitted to the state engineer. The application is then investigated by the water resource district. The state engineer may require that applications proposing statewide drainage be returned to him for final approval.

those imposed by § 61–01–22. Thus, the Commission concluded that when Crockett and Cavalier County failed to obtain authorization from both the Commission and the State Engineer, they violated § 61–01–22 and § 61–15–08, NDCC. Crockett and the Cavalier County Water Resource District, however, argued that these sections conflicted and were irreconcilable. The lower court found that:

> "[S]ection 61–01–22 was last amended subsequent to Section 61–15–08 and, under the Rules of Construction, impliedly, if followed, [§ 61–01–22] would be a defense to Section 61–15–08 . . . ."

We have already concluded that § 61–01–22 did not apply to Cavalier County and therefore its provisions were not violated. Thus, we need not reach Cavalier County Water Resource District's argument that § 61–01–22 and § 61–15–08 are irreconcilable or that § 61–01–22 is a defense to § 61–15–08.[9]

As earlier noted, the Commission and State Engineer participated in the resolution of disputes which resulted in approval of the 1969 water management plan. Cavalier County Water Resource District thus had the State Engineer's tacit approval, and was in compliance with § 61–15–08 while implementing the 1969 plan. We cannot conclude that the appellees then violated § 61–15–08 by implementing what they considered to be drainage systems designed to correct the deficiencies of the 1969 plan. In this case we find that Cavalier County Water Resource District and Crockett reasonably relied upon § 61–21–02, § 61–01–22, and § 61–15–08, NDCC to justify the drainage activities.

Although we disagree with the rationale of the trial court and find the judge's reasoning incorrect, "we will not reverse the proper judgment on that basis." *Bohn v. Bohn Implement Co.,* 325 N.W.2d 281, 283 (N.D.1982); *KFGO Radio, Inc. v. Rothe,* 298 N.W.2d 505 (N.D.1980). Accordingly, the judgment dismissing the action is affirmed.

This being a matter of great public interest, all parties will bear the costs that each has incurred.

ERICKSTAD, C.J., SAND and PAULSON, JJ., and ILVEDSON, Surrogate Judge, concur.

ILVEDSON, Surrogate Judge, sitting in place of VANDE WALLE, J., disqualified.

---

**9.** Because we find that Cavalier County was exempt from the requirements of § 61–01–22, we need not reach the question of whether or not Cavalier County Water Resource District was required to issue a written permit to satisfy the requirements of § 61–01–22, NDCC.