UNITED STATES of America, Appellee,

v.

Kent Melvin VESTERSO, Warren August Anderson, Davis Leas, Appellants.

No. 86–5231.

United States Court of Appeals, Eighth Circuit.

Submitted March 9, 1987.

Decided Aug. 31, 1987.

---

Larry M. Baer, Cando, N.D., for appellants.

Lynn E. Crooks, Asst. U.S. Atty., Fargo, N.D., for appellee.

Before HEANEY and ARNOLD, Circuit Judges, and LARSON,* Senior District Judge.

HEANEY, Circuit Judge.

Appellants Kent Melvin Vesterso, Warren August Anderson, and David Leas appeal their convictions under 16 U.S.C. § 668dd(c) for damaging property located in waterfowl production easements contained in the National Wildlife Refuge System. We affirm.

## BACKGROUND

In 1964 and 1965, the United States purchased easements in Towner County, North Dakota, pursuant to section 4 of the Migratory Bird Hunting Stamp Act of March 16, 1934, 48 Stat. 451, as amended by section 3 of the Act of August 1, 1958, Pub.L. No. 85–585, 72 Stat. 486 (codified as amended at 16 U.S.C. § 718d(c) (Stamp Act)). These easements contained wetlands which provided habitat for wildlife. *See North Dakota v. United States*, 460 U.S. 300, 302–03, 103 S.Ct. 1095, 1097–98, 75 L.Ed.2d 77 (1983). These easements are now a part of the National Wildlife Refuge System and are managed by the United States Fish and Wildlife Service. *See* 16 U.S.C. § 668dd(a)(1) (Wildlife Refuge Act).

In 1983, the Towner County Water Resource District Board (County Water

---

* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

Board),[1] began considering two drainage projects. Appellants Anderson and Vesterso were members of the County Water Board at this time. One project affected two parcels of property, one owned by George Murdock and the other by William and Martha Brunnemeyer. The other project affected property owned by Marcel and Dessie Mantei. All three of these parcels of property were subject to federal easements protecting wetlands.[2]

The appellants claim they considered undertaking the projects because a number of landowners complained of flooding as a result of a build-up of vegetation, rocks, and silt in the wetlands on the three parcels of property. This flooding affected other parcels of property not subject to federal easements.

In July of 1983, Water Board Chairman Anderson applied to the North Dakota Water Commission for permission to undertake the two projects.[3] In their applications the appellants asked the State Water Commission for a permit to "clean out" two "watercourses" which the appellants stated

flowed through the Murdock and Brunnemeyer properties and the Mantei property respectively. The County Water Board informed the North Dakota State Water Commission that one of the federal easements might be affected by one of the projects. Although the North Dakota Water Commission granted a permit to the County Water Board to proceed without a hearing because the project was not of statewide significance, it also advised the County Water Board to review the federal easement affected by the project and to "abide by its conditions."

After receiving the permit, the County Water Board hired a surveyor to design and lay out the path and grade of two ditches which would allow water to flow through the two wetland areas. It was at this time that David Leas joined the County Water Board. A construction company performed the digging with a backhoe. Vesterso and Leas supervised the digging. The completed ditches were flat-bottomed, about fifteen feet wide, and meandered through various parcels of property includ-

1. Created in 1981 by the North Dakota State Legislature, Water Resource District Boards control and manage "water resources" in the state. N.D.Cent.Code § 61–16.1–01 (1985). The Board of County Commissioners in each county within the Water Resource District boundaries appoints from three to five members to the Water Resource District Board. N.D.Cent.Code § 61–16–07 (1985). A majority of the members is necessary to transact business. N.D.Cent. Code § 61–16–09 (1985).

2. The easement encumbering the Murdock property was purchased on May 13, 1965, covering the East ½ of Section 19, Township 161 N., Range 65 West of the 5th P.M., Towner County, North Dakota, from Walter and Katherine Winchell.

   The easement encumbering the Brunnemeyer property was purchased on January 22, 1965, covering all of Section 24, Township 161, N., Range 65W of the 5th P.M. in Towner County, North Dakota from William and Martha Brunnemeyer. The easement encumbering the Mantei property was purchased on October 29, 1964, covering most of section 6, Township 160 N., Range 65 West of the 5th P.M., Towner County, North Dakota, from Marcel and Dessie Mantei.

   Under each of the easements, the original landowners of the parcels:

   for themselves and for their heirs, successors and assigns, covenant and agree that they will cooperate in the maintenance of the aforesaid

lands as a waterfowl production area by not draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes [on their property] by ditching or any other means; by not filling in with earth or any other material or leveling, any part or portion of the [easement area] on which surface water or marsh vegetation is now existing or hereafter reoccurs due to natural causes; and by not burning any areas covered with marsh vegetation. It is understood and agreed that this indenture imposes no other obligations or restrictions upon the [landowners] and that neither they nor their successors, assigns, lessees, or any other person or party claiming under them shall in any way be restricted from carrying on farming practices such as grazing, hay cutting, plowing, working and cropping wetlands when the same are dry of natural causes, and that they may utilize all of the subject lands in the customary manner except for the draining, filling, leveling, and burning provisions mentioned above.

3. Under state law, permits are required for draining water from a pond, slough, or lake comprising eighty acres or more. *See* N.D.Cent. Code § 61–16.1–41 (1985).

ing the three tracts subject to the federal easements. The ditches sloped slightly from beginning to end in order to permit water to flow through them. According to the appellants, the ditches followed two recognized "watercourses." According to the United States, the ditches followed "lineal wetlands."

At no time before completion of the project was the United States Fish and Wildlife Service (Fish and Wildlife Service), which was in charge of managing the easements, *see* 16 U.S.C. § 668dd(a)(1), notified of the projects. The Fish and Wildlife Service first discovered the ditches while on a routine observation flight on March 30, 1984. After inspecting the ditches from the ground, the Fish and Wildlife Service decided that a violation had occurred.

The appellants were charged on December 19, 1985, with damaging federal easements, a petty offense. After a bench trial, the district court found the three appellants guilty. Each appellant was placed on probation for two years terminable upon restoration of the easements to their former condition.

## DISCUSSION

The appellants make the following arguments for the overturning of their convictions: first, that the County Water Board, as a political subdivision of the State of North Dakota, had authority to dig the ditches because the ditches followed watercourses in which the State had an ownership interest or over which the State had regulatory authority; second, that the United States had not properly delineated the wetlands restricted by federal easements and shown that the appellants in fact damaged federal property; third, that the appellants, as members of the County Water Board, were not "persons" within the meaning of 16 U.S.C. § 668dd(c); fourth, that the evidence submitted at trial does not support their conviction.

### 1. Authority to Dig the Ditches Pursuant to State Law

The appellants advance two arguments in support of their authority to dig the ditches through the federal easements.

First, the State of North Dakota has an ownership interest in all watercourses in the State. Because the United States only purchased an interest from private landowners, the State's property interest in the watercourse remained intact and, therefore, the appellants could not have harmed federal property in digging the ditches. Second, the National Wildlife Refuge Act explicitly stated that it had no effect on North Dakota water law. Because state water law permitted the County Water Board to take the actions it did, the County Water Board members did not violate federal law.

### a. The State's Property Interest in Watercourses

The district court concluded that it did not have to consider whether the ditches which were dug followed watercourses as defined by state law. It concluded that the State had no authority to alter the natural topography of the wetlands contained in the easements owned by the Fish and Wildlife Service, even though the State may have had a limited power to clean out the watercourses. Because the district court made no finding regarding the status of the ditches, we assume the appellants are correct in classifying them as watercourses.

We believe that the district court's interpretation comports with federal and state law. Under North Dakota constitutional and statutory law, the State of North Dakota does seem to have at least a limited property interest in either the water in or the "integrity" of watercourses. Article XI, Section 3, of the North Dakota Constitution states that "[a]ll flowing streams and natural watercourses shall forever remain the property of the State for mining, irrigating, and manufacturing purposes." This section, although "not framed to divest the rights of riparian owners in the waters and bed of all natural water courses in the state," was intended to place "the integrity of our water courses beyond the control of individual owners." *State v. Brace,* 76 N.D. 314, 36 N.W.2d 330, 335

(1949) (quoting *Bigelow v. Draper,* 6 N.D. 152, 69 N.W. 570, 573 (1896)).

Furthermore, N.D.Cent.Code section 61–01–01 states that "[w]aters on the surface of the earth excluding diffused surface waters but including surface waters whether flowing in well defined channels or flowing through lakes, ponds, or marshes which constitute integral parts of a stream system, or waters in lakes * * * belong to the public." This section, the North Dakota Supreme Court stated, expresses the public trust doctrine, which, in North Dakota, "permits alienation and allocation of such precious state [water] resources only after an analysis of the present supply and future need." *United Plainsmen v. North Dakota Water Conservation Comm'n,* 247 N.W.2d 457, 462–63 (N.D.1976). *But cf. Summa Corp. v. California ex rel Land Comm'n,* 466 U.S. 198, 104 S.Ct. 1751, 80 L.Ed.2d 237 (1984) (explaining limitation on California public trust doctrine).

■ There are, however, clear limitations on the State's interests in watercourses. As the North Dakota Supreme Court has recognized, "[t]he ownership of *beds* of streams and lakes is quite a different matter from the right to control waters." *North Dakota State Water Comm'n v. Board of Managers,* 332 N.W.2d 254, 258 (N.D.1983) (quoting *State v. Adams,* 251 Minn. 521, 546, 89 N.W.2d 661, 678 (1957), *cert. denied,* 358 U.S. 826, 79 S.Ct. 45, 3 L.Ed.2d 67 (1958)) (emphasis added). While North Dakota may own the beds under navigable streams and lakes, *see United Plainsmen,* 247 N.W.2d at 461, its ownership has not been interpreted to extend to beds of nonnavigable watercourses. *See Ozark-Mahoning Co. v. State,* 76 N.D. 464, 37 N.W.2d 488, 493 (1949) (section 210 of the North Dakota Constitution, currently Article XI, section 3, "has application only to the waters of flowing streams and natural water courses and not to lands underlying non-navigable streams and water courses"); *see also North Dakota State Water Comm'n v. Board of Managers,* 332 N.W.2d at 257–58; Beck & Hart, *The Nature and Extent of Rights in Water in North Dakota,* 51 N.D.L.Rev. 249, 262

(1974). Thus, unless otherwise conveyed, the watercourse bed remains the property of the landowner.

■ As stated in its easement agreements, the United States purchased from the landowner the right to prevent the draining of "any surface water including lakes, ponds, marshes, sloughs, swales, swamps, or potholes, now existing or reoccurring due to natural causes" on the easement tract. Although the United States may not have exclusive ownership rights to the water contained in these features, it clearly has a property interest which permits it to maintain the beds and the banks of these features, through which the nonnavigable watercourses in this case passed, in their natural state. *See United States v. Welte,* 635 F.Supp. 388, 390 (D.N.D.), *affirmed,* 696 F.2d 999 (8th Cir.1982) (citing, *e.g., United States v. Virginia Electric and Power Company,* 365 U.S. 624, 627, 81 S.Ct. 784, 787, 5 L.Ed.2d 838 (1961) (flowage easement is "property" within the meaning of the fifth amendment)); *United States v. Seest,* 631 F.2d 107, 109 (8th Cir. 1980).

■ We do not have to define with greater precision the extent of the United States' property interest in the beds of the watercourses, for it is clear that the district court properly found that the work done under the supervision of the County Water Board damaged wetland property not owned by the State. As the district court stated, the ditches "interfered with the natural topography of the land and altered the flow of the natural waters, including the waters in the wetland basins." Experts for the United States testified that the channels went through a number of identifiable wetlands. Mr. Brunnemeyer testified that the project widened the watercourse as it crossed his property at least three feet and deepened it about two feet. The contractor whose company performed the digging testified on cross-examination by the appellants' attorney that in digging the flat-bottomed ditches on both projects, he broadened the banks and leveled the v-shaped bed. In doing so, he removed a significant amount of clay along the banks of the

channels. Even the appellants' expert witness admitted that he saw one wetland that was affected in a "major" way by the ditch on the Murdock and Brunnemeyer properties. Therefore, the trial court did not err in finding that wetlands not owned by the State had been damaged.[4]

### b. The State's Regulatory Authority

The appellants' second assertion is that the Wildlife Refuge Act permitted state water law to govern the easements. Thus, the County Water Board would have the same authority to widen or deepen a watercourse as under state law. *See* N.D.Cent. Code § 61–16.1–09(6) (1985) (as amended). The appellants cite 16 U.S.C. § 668dd(i). This provision states that "[n]othing in this Act shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws." According to the appellants, this section was intended to preserve continued and unaltered state regulation of water and hence regulation of watercourses flowing through tracts subject to federal easements.

We believe the express terms of section 668dd(i) demand a different interpretation. If the provision omitted the word "denial" and simply stated "[n]othing in this Act shall constitute an express or implied claim * * * on the part of the Federal Government as to exemption from State water laws," this would be a different matter. In such an instance state water laws would probably be interpreted to apply to the federal property interests as they would to private interests. "Denial," however, is included in the statute.

■ We believe the clear purpose of this provision was simply to prevent a general preemption of state water laws as they affected the federal easements. In other words, the terms of the Wildlife Refuge Act were to be given their full effect, and any conflict with state law would be dealt with on a case-by-case basis.[5]

---

**4.** This is not to say, however, that the United States has an absolute right to allow a watercourse crossing an easement to become plugged with debris to the extent that it no longer flows and floods adjacent property not subject to a federal easement. In this case, there was some evidence at trial that portions of the watercourses flowing through the Murdock and Brunnemeyer parcels had become unnaturally plugged due to plowing over the watercourses while the watercourses were dry. Such plowing of dry areas is permitted by the terms of the easement agreements. In addition, on the Mantei property large rocks had apparently been dumped in the watercourse. Such unnatural restrictions on the flow may have caused more flooding on adjacent parcels of property than had occurred in previous years.

Either the State of North Dakota, as discussed above, or adjacent property owners may have a right to have unnatural restrictions removed from watercourses crossing federal easements. This right of the adjacent landowners could stem from the reasonable use doctrine which would prohibit a neighboring landowner from restricting or expanding the natural flow of surface waters so as to cause an undue burden on the adjacent landowner's property. *See Nilson v. Markestad,* 353 N.W.2d 312, 315 (N.D.1984) (citing *Lemer v. Koble,* 86 N.W.2d 44 (N.D. 1957)).

**5.** The legislative history of the 1966 Act is "not illuminating" as to the meaning of section

668dd(i). The appellants cite the legislative history of the Wilderness Act which contains an identical provision. *See* 16 U.S.C. § 1133(d)(6). As the appellants note, under this provision, Congress intended that "Federal-State relationships concerning water laws and wildlife [be] maintained without change." H.R.Rep. 2521, 87th Cong., 2d Sess. 27 (1962). Clearly what is meant here is that section 1133(d)(6) of the Wilderness Act is not to be interpreted as changing the body of law which interprets the interaction of federal and state interests in water.

This interpretation comports with that of the only case we have located which analyzes this section of the Wilderness Act. In *Sierra Club v. Lyng,* 661 F.Supp. 1490 (D.Col.1987), the court stated:

A plain reading of section [1133(d)(6)] indicates that section is simply a disclaimer. "By its drafting and passage of * * * 16 U.S.C. § 1133(d)(6), Congress meant to do nothing more than to maintain the status quo of basic water law. * * *."

Courts often bear the responsibility of adjudicating the interaction between newly created congressional programs and pre-existing state law. Case-by-case harmonization of a congressional mandate with state law fulfills the assignment given the courts in the separation of powers process contemplated by the Constitution. In section [1133(d)(6)], Congress sanctioned this completely normal process by expressly disclaiming any decisional responsibility in this regard.

■ Any state regulatory authority which might permit the widening and deepening of watercourses and hence the draining of wetlands on federal easements would directly conflict with the very essence of the Wildlife Refuge Act and the Stamp Act. The Wildlife Refuge Act states that "[n]o person shall knowingly disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States, including natural growth, in any area of the System." 16 U.S.C. § 668dd(c). If nothing else, the digging certainly "disturbed" "natural growth" on the easements. The language in the easement agreements forbids the landowners, their heirs, successors, and assigns from "draining or permitting the draining, through the transfer of appurtenant water rights or otherwise, of any surface water including lakes, ponds, marshes, sloughs, swales, swamps or potholes, now existing or reoccurring due to natural causes on the above-described tract, by ditching or any other means * * *." Although the easement states its claim against the landowner, the easement agreements' language also defines the extent of the United States' property interest. Clearly that interest included the preservation of wetland areas in an essentially natural state. Ditching is expressly prohibited.

### 2. Delineation of the Acres Covered by the Easements

■ The appellants claim that the United States did not establish that the wetlands damaged in this case were actually covered by federal easements. According to the appellants, Congress allowed the State to limit the number of acres which could be subject to federal easements. The appellants assert that the limit established by the State has been exceeded. Because it has not been established which wetlands were within the limitation and which were without it, it has not been established beyond a reasonable doubt that the appellants damaged federal property.[6]

There are limitations on the number of acres of wetlands that the United States can purchase pursuant to the Stamp Act. Under the Stamp Act, 16 U.S.C. § 715k–5, state gubernatorial consent is required for the purchase of easements in the state. *North Dakota v. United States*, 460 U.S. at 310 n. 13, 103 S.Ct. at 1101 n. 13 (interpreting section 715k–5). The State of North Dakota consented to the acquisition of easements covering 1.5 million acres between 1961 and 1977. *Id.* at 310, 103 S.Ct. at 1101. Such acquisitions were limited to a specified number of acres in each county. *Id.* at 305, 103 S.Ct. at 1098–99. The appellants attempted to submit evidence that in Towner County, the State imposed an acreage limitation of 27,000. They also attempted to submit evidence that the acreage of the parcels encumbered with the easements in Towner County was 151,743. The trial court denied these offers of proof. We hold that the trial court did so properly.

■ The decisions of this Court and the Supreme Court have established that the acreage limitation in the gubernatorial consents applies to the established wetland within a parcel and not to the entire parcel subject to the easement. Thus, in *North Dakota v. United States*, the Supreme Court stated:

As the easement agreements make clear * * * the restrictions apply only to wetlands areas and not the entire parcels. The consents obtained by the United States authorize it to acquire up to 1.5 million "acres of wetlands." * * * The fact that the easement agreements include legal descriptions of much larger parcels does not change the acreage of

---

**6.** The appellants also make two further claims. First, the United States failed to prove that it had a valid easement title. We find this claim to have no merit because the United States introduced certified copies of the easement agreements and offered proof of the Fish and Wildlife Service's management of the easements. No defects in the title were claimed. Second, the appellants claim that the easement document is so vague, in not including watercourses, that it fails to give due notice. The definition in the easement, however, uses several terms "lakes, ponds, marshes, sloughs, swales, swamps and potholes" whose meaning is clear to "ordinary people." *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

the wetlands over which easements have been acquired.

460 U.S. at 311 n. 14, 103 S.Ct. at 1102 n. 14.

This obviously means that the restrictions mentioned in the easement agreements do not apply to portions of property, which, although included within the easements' legal description, do not meet the definition of a wetland as expressed in the easement agreements. This coincides with the clear purpose of identifying acreage limitations in the gubernatorial consents—to limit the amount of property that can be subject to restrictions.

■ Before the United States can prove a person damaged federal property as prohibited by section 668dd(c), it does not have to describe legally each wetland to which the restrictions apply and further determine whether the total wetland acreage exceeds the limits of the gubernatorial consent for a county. The presence of the recorded easement agreements describing wetlands in clear terms and the existence of identifiable wetlands on the parcel are sufficient proof that the United States has a property interest in the wetlands on the parcel. The gubernatorial consent to the acquisition of the federal easements described in the easement agreements has already been given. It cannot now have an effect on that property interest. As the Supreme Court stated in *North Dakota v. United States*, 460 U.S. at 315, 103 S.Ct. at 1103–04: "Clearly, Congress intended the States to play an important role in the planning process. But once plans have been made and the Governor's approval has been given, the role of the State indeed is at an end." *Cf. State of Nevada v. United States*, 547 F.Supp. 776 (D.Nev.), *affirmed*, 731 F.2d 633 (1982) (finding that invocation of state consent provision in 16 U.S.C. § 715f was barred by the statute of limitations in 28 U.S.C. § 2409a(f) and in *dictum* that section 715f must be enforced at the time of the transaction). Thus, it is sufficient for the United States to prove beyond a reasonable doubt that identifiable wetlands were damaged and that those wetlands were within parcels subject to federal easements. *See United States v. Welte*, 635 F.Supp. at 389–90.

### 3. Not "persons" Within the Meaning of the Act

■ The appellants contend that the language of the Wildlife Refuge Act does not permit the prosecution of state officials acting in their official capacity. The appellants point to 16 U.S.C. § 668dd(c), which states that "no person shall knowingly disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States." The Wildlife Refuge Act defines "persons" as "any individual, partnership, corporation, or association." 16 U.S.C. § 668ee(a). "State" is separately defined as one of the "several States of the United States." 16 U.S.C. § 668ee(c). According to the appellants, they could not be properly prosecuted because they acted in their official capacity, i.e., as the "State" and never as individuals or "persons" who are prohibited from doing the enumerated acts.

A reading of 16 U.S.C. § 668dd(c) in the context of the entire Wildlife Refuge Act refutes the appellants' argument. The Act clearly uses the term "person" in such a way as to include public officials within its meaning. We find no evidence of a contrary legislative intent.[7] Therefore, we conclude that the Wildlife Refuge Act's express language is conclusive as to its meaning. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

For example, in section 668dd(c) itself, an exception from the prohibited acts is made for "persons authorized to manage" waterfowl production areas. It stands to reason that a person authorized to manage these areas would likely be a government official, for instance, a refuge manager from the Fish and Wildlife Service. Or, in some

---

7. *See* S.Rep. No. 1463, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin. News 3342, 3347; Conf.R. No. 2205, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin.News 3358; H.R.Rep. No. 1168, 89th Cong., 2d Sess.

instances, that "authorized person" could be a state official acting under the express authority of the Wildlife Refuge Act in managing, controlling, or regulating "fish and resident wildlife under State law or regulations in any area within the System." 16 U.S.C. § 668dd(c). Nonetheless, in either case, what is crucial is that the Wildlife Refuge Act does not use the term "authorized official" or just "official" in an attempt to draw a distinction between officials and private individuals.[8] Rather, the operative distinction is between "authorized" and "unauthorized persons."[9] Clearly the County Water Board members, regardless of whether they were also state officials, were not "authorized persons" under the Wildlife Refuge Act.

Moreover, even if the statute were not so clear, the case law demonstrates that federal criminal statutes generally have not made a distinction between acts done by public officials in their official and unofficial capacity. "Criminal activity is private activity even when it is carried out in a public forum and even though the activity can only be undertaken by an official's use of a state given power." *United States v. Thompson*, 685 F.2d 993, 1001 (6th Cir.) (en banc), *cert. denied*, 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982) (applying 18 U.S.C. § 1961 of the Racketeer Influenced and Corrupt Organizations Act (RICO) to officials connected with state governor's office).[10]

▮▮ In addition, although state legislators or legislative officials have an immunity from federal civil suit, *see Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), they do not have such immunity from federal criminal prosecution, even for acts done in an official capacity. *United States v. Gillock*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980). In *Gillock*, a Tennessee state senator, among other things, agreed to introduce state legislation which would enable four persons to obtain master electricians' licenses which they had been unable to gain through existing examination processes. The United States indicted the senator for violating RICO. The main issue in *Gillock* was whether the senator had a privilege under the Speech or Debate Clause of the Federal Constitution, federal common law, or the Federal Rules of Evidence which would bar introduction of evidence of the legislative acts of the senator. The Court held that he did not have such a privilege. 445 U.S. at 374, 100 S.Ct. at 1194. As the Court stated, "the cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Id.* at 372, 100 S.Ct. at 1193.

Finally, application of 16 U.S.C. § 668dd(e) to the appellants is congruent with the purpose of the Wildlife Refuge Act. Certainly Congress contemplated that state officials acting through state agencies, as well as private individuals, might threaten wetlands on federal easements. This is especially true in light of the substantial regulatory powers of the State of North Dakota over its watercourses. As the United States points out, the County Water Boards consist of appointed officials

---

8. When the Act intends to mean "private individual," it uses that very term. *See* 16 U.S.C. § 668dd(d)(2) where it states that "[n]otwithstanding any other provision of law, the Secretary of the Interior may not grant to any Federal, State, or local agency or to any *private individual* or organization any right-of-way, easement, or reservation in, over, across, through, or under any area within the system in connection with any use permitted by him under paragraph (1)(B) of this subsection unless * * *." (Emphasis added.)

9. This distinction is highlighted in a section which states "[a]ny *person authorized* by the Secretary of the Interior to enforce the provi-

sions of this Act or any regulations issued thereunder, may, without a warrant, arrest any *person* violating this Act or regulations in his presence or view, and may execute any warrant or other process issued by an officer or court of competent jurisdiction to enforce the provisions of this Act or regulations." 16 U.S.C. § 668dd(f) (emphasis added).

10. This is also consistent with the established principle that corporate officers may be held personally liable for acts done in their capacity as corporate officials. *United States v. Richmond*, 700 F.2d 1183, 1194 (8th Cir.1983) (prosecution under 18 U.S.C. § 1001).

from the county. If these officials could avoid prosecution, pressure from citizens might convince the County Water Board to do what the citizens could not. Or, it is possible that County Water Board officials might themselves have an interest furthered by the destruction of wetlands on federal easements. The district court found in this case that two of the appellants had private farming operations which were benefited by the County Water Board projects. If the ultimate goal of the Act is to prevent the destruction of wildfowl habitat, that goal would be significantly hampered if state officials were not subject to its criminal provisions.

### 4. Sufficiency of the Evidence

■ The appellants claim both that there was insufficient evidence to show that each appellant did the proscribed acts and that each appellant violated the Act "knowingly." We cannot overturn the trial court's findings unless they are clearly erroneous. *United States v. Picone*, 773 F.2d 224 (8th Cir.1985) (per curiam).

The district court found that Vesterso, Leas, and Anderson "actively participated in the direction and construction of each of these projects," and that they did so knowing that their actions would affect the federal easements. This finding is not clearly erroneous.

The State Engineer testified that he reviewed the applications for the two projects sent to the State Water Commission and that Anderson had signed them. Numerous witnesses testified that Vesterso and Leas contacted them about the projects. Mr. Brunnemeyer testified that Vesterso and Leas visited him before the project across his land was undertaken. They described to Mr. Brunnemeyer where the ditch would go, how it would be dug, and who would pay for it. Mr. Brunnemeyer also mentioned to Vesterso and Leas that his property was subject to a federal easement. Murdock only remembered talking to Vesterso who first mentioned to him the proposed project. Mantei first heard about the project when a neighbor asked him to go to a meeting. Vesterso and Anderson were at the meeting. Mantei mentioned the federal easement on his property at the meeting and was told that "they would check on it."

The surveyor who worked on the project stated that Leas talked to him on the telephone about the proposed project. Vesterso drove along the route of the ditch and pointed out the channel which the surveyor was to follow. The contractor who did the actual digging stated that he dealt with Vesterso as the representative of the County Water Board and that Vesterso came to the field to monitor the progress. The appellants offered no evidence that any one of them was not involved in the project. Instead, the defense primarily concentrated on establishing that each of the appellants acted for the County Water Board in planning and supervising the projects. The trial court's finding that each of the appellants did the proscribed acts is not clearly erroneous.

It is also clear that each appellant knew that the Murdock, Brunnemeyer, and Mantei properties were subject to federal easements. They had constructive knowledge of the easement agreements as public records, the State Water Commission notified them that the parcels were encumbered by federal easements, and some of the landowners told each of them that their properties were subject to federal easements.

The appellants counter that they did not know which portions of the parcels were subject to the restrictions in the easement agreements. They claim they did not know because they were unsure whether the acreage limitations established in the consents were exceeded and because the United States had not identified with aerial photographs or drawings where the protected wetlands were on each parcel. If the appellants did not know, their lack of knowledge was caused by "willful blindness." Here, if the appellants had any doubts, they could have easily consulted the Fish and Wildlife Service to find which areas in the easements were wetlands. There is substantial evidence that the appellants deliberately did not do this. Thus,

"knowledge" can be found in this case because each appellant consciously avoided enlightenment. *See United States v. Massa*, 740 F.2d 629, 642–43 (8th Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).[11] The trial court's finding that the appellants knowingly damaged federal property is not clearly erroneous.

### CONCLUSION

We realize that the federal wetland easements in North Dakota have generated controversy and, in some instances, frustration for landowners. *See North Dakota v. United States*, 460 U.S. at 306, 103 S.Ct. at 1099. We point out, however, that the State of North Dakota and landowners are not without recourse if the easements cause flooding, for example, which results from nonnatural obstructions to water flow. The prudent course in any event requires consultation with the Fish and Wildlife Service before undertaking drainage on parcels covered by easements. As the evidence in this case shows, the Fish and Wildlife Service at one time permitted Mr. Brunnemeyer to *clean out*, under its supervision, the watercourse running through the easement on his property. There is no evidence in the record indicating that this cooperation would not have been forthcoming in this case. Instead of seeking cooperation, the appellants acted on their own by digging a ditch approximately three feet deep and fifteen feet wide across the easement in clear violation of the Wildlife Refuge Act.

---

11. Here we only infer the knowledge of the likely damage to federal property and not the specific intent to damage such property since section 668dd(c) does not require a specific intent. *See Welte*, 635 F.Supp. at 390 n. 4.